Benjamin Mayer, Plaintiff in Error, v. The People of
    the State of New York, Defendant in Error.

Where upon the trial of an indictment for obtaining goods on credit, by
    means of false representations on the part of the prisoner, as to his
    responsibility, the representations charged, their falsity, and the knowl-
    edge of the accused that they were false is established, the allegation
    that they were made with intent to defraud may be supported by proof
    of dealings of the prisoner with parties other than the complainant, such
    as purchases made upon the faith of similar representations, which tend
    to show a fraudulent scheme to obtain property by devices similar to
    those practiced upon him, provided the dealings are sufficiently con-
    nected in point of time and character, to authorize an inference that the
    purchase from the complainant was made in pursuance of the same
    general purpose.

So, also, similar representations made by the prisoner to creditors, from
    whom goods had been previously purchased by him, although no goods
    were obtained by means of the representations, may be proved when
    evidence has been given tending to show that he was at the time mak-
    ing fraudulent disposition of the goods purchased.

Such testimony is relevant, not as bearing upon the question whether the
    prisoner made the representations charged, but as tending to show a
    motive in pursuance of the general fraudulent scheme, to quiet the
    creditors and retain control of the goods, so as to continue the fraudulent
    disposition of them.

Upon the trial of such an indictment, S., a witness for the prosecution,
    was asked on cross-examination as to a conversation with one M.  On
    redirect-examination he testified to statements made to him by M. in
    that conversation, to the effect that the prisoner and his partner had
    done a great wrong.  M. was thereafter called as a witness for the
    prisoner, and gave material testimony of statements made by the prose-
    cutor, contradicting his testimony, and tending to show the prisoner's
    innocence; he also positively contradicted the testimony of S.  On his
    cross-examination he was asked if he had not said to any body that the
    prisoner and his partner had been guilty of a great wrong, also if he
    had not said that they had acted as thieves, these questions were
    objected to, objection overruled and exception taken; the witness
    answered in substance that he did not remember.  Held (Church, Ch.
    J., and Danforth, J., dissenting), that the allowance of the questions
    was not error.

(Argued February 27, 1880; decided March 19, 1880.)

Error to the General Term of the Supreme Court, in the
first judicial department, to review judgment affirming a
judgment of the Court of Oyer and Terminer, in and for

the county of New York, entered upon a verdict convicting the plaintiff of the crime of obtaining goods by false pretences.

The material facts are set forth in the opinion.

*Amasa J. Parker*, for plaintiff in error. The court erred in receiving in evidence an alleged conversation had subsequent to the alleged purchases from the witness, and not at the time of the sale to induce credit. (*People* v. *Haynes*, 14 Wend., 547; *People* v. *Tompkins*, 1 Parker Cr., 224; *Ranney* v. *People*, 22 N. Y., 413.) The learned judge erred in allowing the prosecution to give in evidence under the objection and exception, statements made by the plaintiff in error, in February, 1876, in order to obtain credit from parties other than the complainant. (*Biellschoffsky* v. *People*, 3 Hun, 40; 60 N. Y., 616; *Weyman* v. *People*, 4 Hun, 511; 62 N. Y., 623; *Coleman* v. *People*, 55 id., 81; *People* v. *Justices of Special Sessions*, 10 Hun, 158.) The court erred in allowing the prosecuting officer to ask the witness, Ferdinand Mayer, if he had said that plaintiff in error and Hirsch, had done a great wrong, meaning the failure of Hirsch & Mayer, and had acted as thieves. (*Stokes* v. *People*, 53 N. Y., 164–183; *Coleman* v. *People*, 58 id., 555; *People* v. *Evers*, 3 Hun, 716, 719; 63 N. Y., 625; *People* v. *Gonzales*, 35 id., 59; *Vardervoost* v. *Gould*, 36 id., 644; *Anderson* v. *Rome*, 54 id., 334; *People* v. *Casey*, 72 id., 393.) It is only as part of the *res gesta*, that evidence of other acts can be received in a criminal case to show the intent. (2 Best on Evidence [Wood's ed., 1876], 876, 88 note; *Reg.* v. *Oddy*, 5 Cox C. C., 210, 215; *Copperman* v. *People*, 56 N. Y., 594; *People* v. *Corbin*, 56 id., 363, 365; *Coleman* v. *People*, 55 id., 82, 90; 4 C. H. Recorder, 143, 147.) In such cases, only prior acts, never subsequent acts, can be inquired into. (*Rex* v. *Francis*, 12 Cox C. R., 612; *Hitchcok's Case*, 6 C. H. Rec., 43; *King* v. *Parsons*, 1 Wm. Black, 932; *Rex* v. *Roberts*, 1 Camp., 399.) Such evidence could not fail to mislead the jury, and it will be assumed that it did so. (*Coleman* v. *People*, 58 N. Y., 555.)

Opinion of the Court, per RAPALLO, J.

*Benj. K. Phelps*, for defendant in error. On a trial for a criminal offence other offences of a similar character may be proved, if they tend to show the *quo animo* of the offence in question, although they may also tend to show the accused has committed another indictable crime. (1 Whart. Amer. Crim. Law [6th ed.], § 649; 3 Greenl., § 15; Steph. Dig. of Evi., art. 11 [May's ed.], 56; Id, art. 12, p. 61; *Rex v. Robert*, 3 Camp., 399; *Rex v. Ellis*, 6 Barn. & Cress., 145; *Defrese v. State*, 1 Green C. R., 356; *Rex v. Davis*, 6 Car. & Payne, 177; *Rex v. Wylie*, 1 N. R., 94; *Rex v. Dossett*, 2 Car. & Kir., 306; *Com. v. Choate*, 105 Mass., 459; *Dunn's Case*, 1 Moo. C. C., 146; *Rex v. Oddy*, 2 Den. C. C., 264; *Rex v. Foster*, Dear., 456; *Bottomly v. U. S.*, 1 Story, 135; *The State v. Williams*, 2 Rich., 418; *Wood v. U. S.*, 16 Peters, 360; *Reg. v. Richardson*, 8 Cox C. C., 448; *Reg. v. Frances*, 12 id., 612; *Reg. v. Cooper*, L. R. [12 Q. B.], 19; *Reg. v. Geering*, 18 L. J. [M. C.], 215; *Stout v. People*, 4 Park. C. C., 71; *People v. Wood*, 3 id., 681; *Com. v. Ferrigan*, 44 Penn. St., 386; *Com. v. Price*, 10 Gray, 472; *Com. v. Stone*, 4 Met., 43; *Com. v. Coe*, 115 Mass., 481; *Com. v. Eastman*, 1 Cush., 189; *Hitchcock's Case*, 6 C. H. Rec., 43; *Com. v. Tuckerman*, 10 Gray, 179; *Copperman v. The People*, 56 N. Y., 591; *Biellschoffsky v. The People*, 3 Hun, 40; *Weyman v. The People*, 4 id., 511.) The evidence received in this case was not too remote from the transaction for which the defendant was on trial. (*Willis Case*, 10 Hun, 158; *Com. v. Edgerly*, 10 Allen, 186; *Rex v. Balls*, 1 Moo. C. C., 470; *Reg. v. Nisbett*, 6 Cox C. C., 320; *State v. William Ford*, 3 Strob. [S. C.], 517; *Copperman's Case*, 56 N. Y., 591.) The limit of impeaching questions on cross-examination is largely within the discretion of the trial court. (*Casey v. People*, 72 N. Y., 393–399; *People v. Brown*, 72 id., 573.)

RAPALLO, J. The representation charged in the indictment was, in substance, that the defendant's firm of Hirsch & Mayer had, on the 1st of January, 1876, balanced its books

and taken an account of stock, and that its assets, consisting of cash, merchandise, bills receivable and live accounts, exceeded its liabilities by the sum of $25,000. The prosecutor testified to the making of the representations by Mayer, on the 28th of January, 1876, and to the sale of goods to Hirsch & Mayer on that day, on the faith of such representations. It appeared in evidence that the firm failed early in April, 1876, largely insolvent; that its books had never been balanced, and an examination of the books disclosed that the firm had long been insolvent, the drafts of the members for their personal expenses having far exceeded their capital and profits, and that a large deficiency in the assets existed on the 1st of January, 1876; that the greater part of its liabilities, existing at the time of its failure, had been contracted between January 1st and April 7, 1876, and that at the last mentioned date its debts exceeded its apparent assets by upward of $70,000.

The actual financial condition of the firm was not the subject of much controversy on the trial, but the defense rested mainly upon a denial of the making of the representations, and of the knowledge of the defendant of the state of the accounts of the firm.

Evidence was introduced, on the part of the prosecution, in respect to the dealings of the firm between January, 1876, and the time of the failure. The prosecutor testified, without objection, to two sales of goods made by him to Hirsch & Mayer, subsequent to that charged in the indictment, viz.: on the eleventh and fifteenth of February, and that on the last occasion the defendant declared that the statement he had previously made was correct. John H. Rhodes, a witness on the part of the prosecution, then testified to a sale of goods by his firm of Rhodes, Grosvenor & Co. to Hirsch & Mayer, in the latter part of March, 1876, and being interrogated as to the conversation which then took place between him and the defendant, the inquiry was objected to as too remote, and the court held it inadmissible on the question of intent, as the case then stood, and it was sus-

pended until witnesses to intermediate transactions should be called. The witness was then asked what was said by Mayer or by Hirsch, in his presence, as to the amount of their stock on the first of January, and the court permitted this question to be put for the purpose of showing the condition of the firm on the first of January, and for that purpose only. An exception was taken to this ruling, but we see no good objection to the evidence, it being competent as an admission of the defendant, for the purpose of showing the amount of stock on hand at the time referred to. Joseph F. Low was then called as a witness, and testified to a sale of goods by him to the defendant, on the 31st of January, 1876 ; that he declined to deliver the goods without a statement of the condition of defendant's firm, and that defendant then stated that he had a good sound capital of $25,000, and would make a statement in detail if desired. This evidence was not objected to. The prosecution then proved, without objection, by Ezra C. Dillingham a sale made by him to defendant, on the 14th of February, 1876, on his statement that he was perfectly good, and further sales on the same statement on the twenty-first of February, and first of March and twenty-first of March. The witness was then interrogated as to the statement made to him by the defendant in April, a few days before his failure, as to his financial condition, and this was objected to as immaterial and incompetent, and too remote, on the ground that no property was parted with at the time. This objection was overruled, and an exception taken, and the witness then testified that he said to defendant that he had heard rumors of the failure of his firm, and defendant replied that there was nothing in it, that witness' claim was good and would be paid, and he need have no fear as to the future. Defendant's counsel moved to strike out this evidence as not bearing upon the question of fraudulent intent in January. The motion was denied, and an exception taken.

The same line of inquiry was pursued with other witnesses, under exceptions taken by the defendant's counsel. Carl

Voight was allowed to testify to a statement of defendant on the twenty-second of March, as to his condition, the sale to him by that witness having been made on the thirteenth of March, and the goods delivered on his promise to make a statement. The statement made on the twenty-second corresponded substantially with that charged in the indictment, but was more in detail. The witness Rhodes was recalled, and testified to a substantially similar statement in the latter part of March, as to the condition of the firm on the first of January; but the sale by Rhodes had been completed long before the making of the statement. Alfred Woodbridge was allowed to be asked as to representations in January, after a sale and delivery of goods. The point raised by all these exceptions is substantially the same. It does not controvert the general rule that cotemporaneous purchases, made on the faith of representations similar to those made to the prosecutor, may be shown as bearing on the question of intent. but is, that they do not fall within the rule, for the reason that the representations proved were made after the goods had been obtained, and no goods were obtained by means of the representations; and the further point as to some of them, at least, that they were made so long after the purchase from the prosecutor that they cannot be treated as cotemporaneous.

As to the question of time, we think that, under the circumstances of the case, it was not too remote. The purchase from the prosecutor was made in the latter part of January, the twenty-eighth, and the failure was April seventh. The representations to others were made during this interval; and the theory of the prosecution, in support of which the evidence was offered, was that during all this period the defendant, or he and his partner, were acting in pursuance of a scheme to obtain property by means of false representations as to their solvency, and by keeping up their credit, with intent to convert the property to their own use, and defraud the vendors of its value.

The evidence shows that the firm was insolvent at and

before the time when the defendant made the purchase from the prosecutor, and we think that its dealings between that time and the day when the fact of its insolvency became public, a period of a little over two months, were a proper subject of investigation, for the purpose of ascertaining whether they disclosed the scheme and intention charged. If it existed in respect to the other purchases made during the period in question, it may be inferred that the purchase set forth in the indictment was a part of the same fraudulent plan.

The main reliance of the defendant's counsel at the trial appears to have been upon the point that no goods were obtained by means of the representations now under consideration, the goods having been obtained before the representations were made, and that therefore they did not tend to show a fraudulent intent, and were irrelevant.   In passing upon this question it is necessary to look at the whole case, for even if enough had not been shown at the time the evidence was admitted, to render it material, yet if the subsequent proofs showed its materiality, the question became merely one of the order of proof, and no error was committed.   The objection, it must be observed, is rather to the relevancy than to the competency of the evidence.   It consisted of the declarations of the defendant himself, which are in general competent, and the objection that they tended to prove him guilty of a crime other than that charged in the indictment, does not exist in respect to these declarations, for the very ground of the objection made is that they do not tend to establish any such crime, inasmuch as they were not made for the purpose of obtaining goods, and no goods were obtained by their means.   To test their relevancy the position of the parties at the time must be considered.   The prosecutor proved that goods had been obtained from him by representations of solvency shown to have been false.   The defendant denied the representations and denied any intent to defraud, alleging his ignorance of the state of his books.   It was shown that the defendant

went on continuously during the months of January, February and March purchasing goods on credit, and in several instances that the purchases were made on representations similar to those alleged by the prosecutor to have been made to him and that during that period upwards of $70,000 worth of goods were purchased. Testimony was given that some of these goods were sent to auction in the name of a third party and others were sent to relatives, and large payments of money were made to them and that at the time of the failure, on the seventh of April, but $2,000 or $3,000 worth of goods remained on hand and the entire assets of the firm amounted apparently to only $6,500 while its indebtedness was upwards of $80,000. The defendant's partner estimated the assets at $11,000 and the debts at $79,000. The large deficit existing on the defendant's own showing is not accounted for in any satisfactory manner, and even the large sums charged in the books to the partners as drawn out by them are not sufficient to cover it. If the testimony on the part of the prosecution is to be credited it is impossible to conceive that during the latter part of this period the defendant could have been ignorant of the fact, not merely that the firm was hopelessly insolvent but that it was utterly rotten and worthless. The evidence objected to showed that notwithstanding all this, he continued, down to the very close to assure his creditors that it was perfectly solvent and that they need have no apprehension as to the payment of their claims. It is true that in the instances objected to, these statements were not made for the purpose of obtaining more goods, for that might have been difficult, but it is equally clear that the motive may have been to quiet the creditors, and retain control of the goods, so as to continue the fraudulent disposition of them, and this would tend to show that they had been acquired with that end in view. We cannot say as matter of fact that the dispositions made of the goods during this interval were fraudulent, and it is not necessary that we should so say. It is enough that the prosecution gave evidence tending to establish that fact,

and it was entitled to give any further evidence which on that theory, if sustained by the jury, would throw light upon the intent with which the goods were purchased. The evidence was consistent with a fraudulent scheme to obtain goods without payment, by false representations of solvency, and to delay exposure of the fraud by further false statements, until they could be effectually disposed of, and we cannot hold that it was so irrelevant that its admission was error.

The mischief to be guarded against in the reception of this testimony, was that the jury might consider it in determining the controverted question whether the defendant in fact made the representations charged, to the prosecutor. It would not have been proper to admit it on that issue, and it was not so admitted. On the contrary, at the request of the defendant's counsel, the jury was expressly cautioned by the court that the testimony, as to representations made to others had no proper relation to the question whether or not those testified to by the prosecutor were made to him, and that it was admitted on the question of intent solely, and the ground upon which it was admitted on that question was very clearly explained to the jury in the charge, and they were instructed, if they did not believe the representations to others to be part of a general purpose or scheme to obtain goods fraudulently, to disregard them, and not to consider them as independent acts, or permit them to work a mere prejudice against the accused.

Exception was also taken to the admission in evidence of a representation to James Low on the 3d of February, 1876, by defendant, that he had in his business $25,000, and was good for all he wanted to buy, by means of which representation he obtained the delivery of goods he had bought a day or two before. This was the same kind of evidence which had been, at a previous stage of the trial, received without objection, and the transaction was within a few days of that with the prosecutor, and the representation was substantially the same alleged to have been made to him.

Opinion of the Court, per RAPALLO, J.

We find no error in its admission for the reasons already stated. The authorities relating to the admission of this description of evidence, as bearing upon the question of intent, were examined in the case of *The People* v. *Shulman*, and are referred to in the opinion of EARL, J.,[*] and although

*The following is that portion of the opinion of EARL, J., in *The People* v. *Shulman*, referred to as concurred in by the court (Rep.):

Note.
80 373
150 386

"Before a person can be convicted under our statute as to false pretences (2 R. S., 677, § 53), it must be proved that he intended to cheat or defraud; that he made the false pretences designedly to obtain property, and that he did obtain property by means of such pretences, so made, and all evidence, legitimately tending to prove these matters, is competent upon the trial. The intent, motive, and knowledge of the prisoner are proper subjects of investigation, and they may be found by evidence of all the circumstances attending the criminal transaction, or by the declarations and conduct of the prisoner, both before and after.

"In Wharton's American Criminal Law (6th ed., § 649), it is said: 'Where the *scienter* or *quo animo* is requisite to and constitutes a necessary and essential part of the crime with which the person is charged, and proof of such guilty knowledge or malicious intention is indispensable to establish his guilt in regard to the transaction in question, testimony of such acts, conduct, or declarations of the accused as tend to establish such knowledge or intent is competent, notwithstanding they may constitute in law a distinct crime.' And 3 Greenleaf on Evidence (§ 15), has the following: 'In the proof of *intention* it is not always necessary that the evidence should apply directly to the particular act with the commission of which the party is charged, for the unlawful intent in the particular case may well be inferred from a similar intent proved to have existed in other transactions done before or after that time.' And in Stephens' Digest of Evidence (May's ed., p. 56), the rule is laid down as follows: 'When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved, if it shows the existence on the occasion in question of any intention, knowledge, good or bad faith, malice, or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue or is deemed to be relevant to the issue.' And at page sixty-one the same author says: 'When there is a question whether an act was accidental or intentional, the fact that such act formed part of a series of similar occurrences, in each of which the person doing the act was concerned, is deemed to be relevant.' (See, also, 1 Greenleaf on Ev., § 53 and notes.)

"These citations from authors of acknowledged repute have abundant support in decided cases, and are sufficient to show the general rules of evidence which we are called upon to consider. They have been applied to a large variety of cases. In the trial of a person charged with passing counterfeit money, proof is always received to show that the prisoner on other occasions, both before and after the time named in the indictment,

in that case there was a difference of opinion, that difference related to the details of the evidence admitted, rather than the general principle involved. The court, with the exception of FOLGER, MILLER and EARL, JJ., were of the opinion that some at least of the testimony was improperly admitted, as proper for the consideration of the jury on the question of the knowledge of the defendant of the falsity of the representations charged. The representations to the prosecutor in that case were made on the 18th of January, 1876. Some

passed other counterfeit bills. On the trial of a person charged with receiving stolen goods, it may be shown that before and after the time of the alleged crime he received other stolen goods from the same party; and the same kind of evidence has been received upon trials for embezzlement. (*Rex* v. *Davis*, 6 Car. & P., 177; *Dunn's Case*, 1 Moody's C. C., 146; *Rex* v. *Balls*, id., 470; *Reg.* v. *Richardson*, 8 Cox C. C., 448; *Com.* v. *Price*, 10 Gray, 472; *Com.* v. *Tuckerman*, id., 179; *Copperman* v. *The People*, 56 N. Y., 591.) And the same class of evidence has been received upon trials for obtaining property by false pretences: (*Reg.* v. *Francis*, 12 Cox C C., 612; *Com.* v. *Stone*, 4 Metc., 43; *Com.* v. *Eastman*, 1 Cush., 189; *Com.* v. *Coe*, 115 Mass., 481; *Bielschofsky* v. *The People*, 3 Hun, 40; affd. 60 N. Y., 616; *Weyman* v. *The People*, 4 Hun, 511; affd. 62 N. Y., 623.) In *Stone's Case*, SHAW, Ch. J., speaking of this kind of evidence, said: 'This is an exception to the general rule of evidence. But it must be considered that it is to prove a fact not provable by direct evidence; that is, a guilty knowledge and purpose of mind, which can rarely be proved by admissions or declarations, and can in general be proved only by external acts and conduct. The case is strictly analogous to the rule in relation to the proof of *scienter* on a charge of passing counterfeit bills or coins.' In *Eastman's Case*, DEWEY, J., said: 'Evidence of other purchases of goods than those charged in the indictment, made by the defendants from other persons during the month of March, 1844, under similar circumstances with the transactions charged in the indictment, was admissible for the purpose of showing the nature of the business of the defendants, and the extent of the purchases made by them, and also as bearing upon the *bona fide* character of the dealings of the defendants with the particular individuals alleged to be defrauded.' In *Wyman's Case*, Judge DANIELS lays down the rule, as follows: 'Where goods have been obtained by means of fraudulent representations, it has been held that as the intent is a fact to be arrived at, it is competent to show that the party accused was engaged in other similar frauds about the same time; provided that the transactions are so connected as to time, and so similar in other relations, that the same motive may reasonably be imputed to them all.'

"And the same rule of evidence has been applied in civil actions. In *Allison* v. *Matthieu* (3 J. R., 234), an action of trover, for goods fraudu-

of the representations to other parties were made in March, 1876, and were different from those made to the prosecutor, and it was held that the falsity of these did not tend to show that those made in the January previous were then known to the defendant to be false.   But on the main proposition discussed in the opinion of EARL, J., there was no material disagreement.   The disagreement was rather in respect to the application of the principle of the cases cited in his opinion, to the case then in hand, and I understand all the

lently purchased of the plaintiff October 1, 1804, the plaintiff was permitted to show purchases of goods of two other persons, by similar representations, on the 5th day of November, 1804.  In *Cary* v. *Hotailing* (1 Hill, 311), the action was replevin to recover property claimed to have been obtained of the plaintiffs by the defendants by means of false representations as to their solvency and credit; and it was held that where the question is whether a vendee of goods procured the sale of them through fraud, distinct purchases made by him of others, under similar circumstances, at or about the same time, and when the like motive as the one imputed may reasonably be supposed to have operated, are admissible in evidence against him, with a view to the *quo animo*.  In *Hall* v. *Naylor* (18 N. Y., 588), there was a similar action, and COMSTOCK, J., said: 'On the trial of such an issue, the *quo animo* of the transaction is the fact to be arrived at; and it is, therefore, competent to show that the party accused was engaged in other similar frauds at or about the same time.  The transactions must be so connected in point of time, and so similar in their other relations, that the same motive may reasonably be imputed to them all.'  In *McKenney* v. *Dingley* (4 Greenl., 172), the action was replevin for a horse claimed by the plaintiff to have been purchased of him by one Reed by false pretences, July 12, 1824, and claimed by the defendant to have been fairly purchased by him of Reed.  It was held competent for the plaintiff to prove, as tending to prove a fraudulent intention, that Reed on the ninth and tenth, and on one or two other days in July, and also on the nineteenth day of August, had made similar false representations to other persons, from whom he had succeeded in obtaining goods to a large amount.  (See, also, *Thompson* v. *Rose*, 16 Conn., 71; *Hawes* v. *Dingley*, 17 Maine, 341; *Howe* v. *Reed*, 12 id., 515; *Rowley* v. *Bigelow*, 12 Pick., 307; *Beal* v. *Thatcher*, 3 Esp., 194.)

"As will be seen by an examination of the cases above cited, and by a consideration of the principles which underlie them, it can make no difference whether the transaction sought to be proved, to throw light upon the main issue, occurred before or after the time of the alleged crime.  They may be more significant in the one case than in the other, but in either case they reflect light upon the main transaction.  Upon the trial of an indictment for passing counterfeit money, where the question to be determined is the guilty knowledge of the prisoner, it has some bearing upon that question that he continued to deal in the same kind of money; and

members of the court to have concurred in the view that when the representations, their falsity, and the knowledge of the accused that they were false, is established by competent testimony, the allegation that they were made with intent to defraud may be supported by proof of dealings of the accused with parties other than the complainant, which tend to show a fraudulent scheme to obtain property by devices similar to those practiced upon him, provided the dealings are sufficiently connected in point of time and character, to authorize an inference that the purchase from

the evidence of such dealing is of the same nature, and, so far as I can perceive of the same value, as evidence of prior dealing. So when a person is charged with procuring property by false pretences, and the question is as to his knowledge, motive, or intent, evidence that soon after, and from time to time afterwards, he continued to obtain property from others in the same way and for the same fraudulent purpose, obviously reflects light upon that question. Such evidence has a direct tendency to show the mind with which he obtained the goods at the prior date.

"But it is said that the transactions proved here were too remote, and not sufficiently related to and connected with the principal transaction to be competent evidence. It is obviously impossible to lay down any general rule limiting the time within which such transactions must have taken place, in order to render proof of them competent. It is generally said in the cases that they must have occurred about the same time as the commission of the alleged crime; but that is quite indefinite, and in some of the reported cases proof of them has been received, although they occurred months before and after the time of the crime. Each case, as to the application of this rule, must depend largely upon its own circumstances, and not unfrequently the limit of them must rest entirely in the discretion of the judge presiding at the trial. For instance, upon the trial of an indictment for passing counterfeit money, upon the question of guilty knowledge, proof that for many months before and after the time of the alleged crime, the prisoner had been engaged daily, weekly or monthly in passing such money, would be competent. The longer the range of time the more conclusive would be the evidence; and yet, in such case, the judge, in the exercise of his discretion, could restrain the investigation within reasonable limits. But there is one general rule which must apply to all such cases; there must be, in the transactions thus sought to be proved, some relation to or connection with the main transaction. That is, they must show a common motive or intent running through all the transactions, or they must be such as in their nature to show guilty knowledge at the time of the main transaction, and if they possess these characteristics, then it matters not whether they were before or after, or near to or remote from the main transaction."

the complainant was made in pursuance of the same general purpose. The difference of opinion which existed in the case referred to, related rather to the question of this connection, than to the general principle.

The remaining exceptions requiring consideration relate to the questions put to the witness Ferdinand Mayer on his cross-examination. In order to pass upon the propriety of these questions it is necessary to refer to what had gone before Mr. Stanton, a member of the prosecutor's firm, had, on his cross-examination by the defendant's counsel, testified that Ferdinand Mayer, who was an uncle and former employer of the defendant, said to the witness that these young men (Hirsch & Mayer) had been prosecuted criminally, and he wished witness would use his influence to settle it; and intimated that, if it could be settled for a small amount of money, his relations might come forward, and the witness denied that the proposition to settle came from him. On his re-direct examination by the prosecutor in reference to this conversation, Mr. Stanton testified that Ferdinand Mayer said to him that these parties were being pursued criminally; and while they had done a great wrong, yet he did not want to see them put in the State prison, and asked witness to use his influence to drop the suit. Ferdinand Mayer was afterwards called as a witness by the defense, and gave very important evidence on behalf of the accused, tending to sustain his denial that he had made the representations charged. He testified that Mr. Davis the prosecutor, in March, 1876, came to the store of witness and asked him his opinion of Hirsch & Mayer, and said he had been after them for two days, and could not get a statement out of them; that witness then said that if he could not get a statement out of a merchant he would not sell him any goods, to which Davis replied that there he had made a mistake; that he had sold the goods and delivered them two weeks ago, and could not get a statement. He further testified that the defendant had been in his employ for seven or eight years, and that while there his conduct was good. The witness was then examined

as to the conversation to which Mr. Stanton had testified, and he positively contradicted his statement that he, witness, had said that Hirsch & Mayer had done a great wrong.

On his cross-examination the witness repeated this denial, and he was then asked whether he had not said to anybody that Hirsch & Mayer had been guilty of a great wrong; to which he answered that he did not remember. He was then asked whether he had not said to several merchants that they had acted as thieves; to which he made the same answer. Being further pressed, he said that he might have been fast about it, but his heart might not think about it. Exceptions were taken to the admission of all these inquiries.

If these questions had been asked by the prosecutor on an examination in chief, they would have been manifestly improper, and it would be difficult to say that their admission was not prejudicial to the defendant. But they were asked on the cross-examination of a witness who had given evidence tending to show the innocence of the defendant, and the fact testified to was one which, if true, would naturally induce the witness to believe him innocent; for if up to March, 1876, Mr. Davis had been unable to obtain any statement from Hirsch & Mayer, it could not well be that the defendant had in January given the definite statement charged in the indictment and testified to by Mr. Davis. Any declarations, therefore, of the belief of the witness in the defendant's guilt, were in some degree inconsistent with this very material piece of evidence which he had given in defendant's favor. The questions put to the witness did not, it is true, point directly to a declaration of his belief in the defendant's guilt of the particular offence for which he was on trial; but it is evident that their object was to draw from a reluctant witness an admission that he had made some such declaration, and the latitude allowable upon cross-examination was not, we think, exceeded in allowing the subject to be approached in the manner in which it was. The answers of the witness were such as to render further inquiry useless; but if he had answered in the affirmative,

it is not difficult to see that a material contradiction might have been reached by following up the inquiry. We do not think the allowance of these questions was error.

The judgment should be affirmed.

Folger, Andrews and Earl, JJ., concur; Church, Ch. J., and Danforth, J., dissent, on ground of admission of question to Ferdinand Mayer on cross-examination; Miller, J., did not vote.

Judgment affirmed.