THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* NICHOLAS MONTANA, Appellant.

First Department, July 16, 1937.

. *Alexander R. Klahr*, for the appellant.

*Felix C. Benvenga* of counsel [*Abraham J. Gellinoff* and *Charles Pilatsky, Assistant District Attorneys*, with him on the brief; *William Copeland Dodge, District Attorney*], for the respondent.

GLENNON, J. The defendant was convicted in the Court of General Sessions of the crime of knowingly receiving money for and on account of procuring and placing a woman in the custody of another for immoral purposes in violation of section 2460, subdivision 6, of the Penal Law. He was sentenced on January 6, 1936, as a second offender, to twenty-five years in State prison, having been convicted previously of grand larceny in the first degree. The trial, which resulted in a conviction, commenced

November 26, 1935, and was completed on December 9, 1935. It might be well to note in passing that on a prior trial, with the same judge presiding, the jury disagreed.

The defendant contends, and properly so, that he did not receive a fair trial. It is proper to say, after reading the record, that the judge presiding apparently had reached the conclusion at the outset, or prior thereto, that the defendant was guilty of the offense with which he was charged, and as a consequence permitted his feelings against the defendant to guide him in the conduct of the trial.

In view of the nature of the testimony, we do not think it proper to review it at length, and, accordingly, we will touch solely on those facts which are necessary to indicate the reasons for our conclusion.

The issue is rather a simple one. The defendant was convicted of the crime of knowingly receiving money, for and on account of procuring and placing one Beverly Reynolds in the custody of one Mildred Davis, for immoral purposes, at 515 West One Hundred and Twenty-fourth street, New York city, on or about February 15, 1934. The Reynolds girl, who, concededly, was a prostitute before she met the accused, gave testimony as to the circumstances which led up to her acquisition of a residence for immoral purposes, with the Davis woman. She related how she become acquainted with the defendant, the arrangements she made with him whereby she was to turn over to him a percentage of her earnings, the number of men with whom she came in contact while residing in the Davis apartment, and also the fact that she actually paid over to him money out of the proceeds she received for her immoral acts.

Mildred Davis gave testimony from which one might conclude that she was present at least on one occasion when Miss Reynolds paid money to the defendant. She corroborated the complaining witness as to the nature of the business in which both were engaged, and also as to the arrangements made by the defendant to share in the proceeds.

Felix Justice, who was employed on the premises at 515 West One Hundred and Twenty-fourth street, Manhattan, testified that on two or three occasions he had seen Miss Reynolds in the Davis apartment, and in one instance, during " the summer months," he saw the defendant, who was about to visit the Davis apartment.

Leon Poll, who was the owner of a rooming house at 18 West One Hundred and Twenty-sixth street, Manhattan, where the Reynolds girl occupied a room, said he recognized the face of the defendant as that of a man who had visited her there in the month of February, 1934.

There was ample testimony given by these witnesses to establish, *prima facie* at least, the crime charged in the indictment. We are not concerned with the credibility of these witnesses, since the jury would have had the right to believe them, even though their criminal records, which were brought out by the assistant district attorney on direct examination, might have led the jury, if it saw fit, to disregard their entire testimony. What the result would have been had certain objectionable testimony, which will be referred to, been excluded, particularly where, as here, the defendant failed to take the stand to deny the accusation, is a matter which may be left solely to speculation.

It must be borne in mind that the defendant was charged in the indictment, in separate counts, with violating section 2460 of the Penal Law on a certain date, and that Beverly Reynolds only was designated as the person who was induced, enticed and procured by him, within the meaning of the statute. That was the charge which he was called upon to meet. In addition to that, however, over the objection of counsel for the defendant, the People were permitted to establish as part of their direct proof, testimony which might indicate that the defendant was guilty of over two hundred separate and distinct violations of the statute. All these so-called offenses were subsequent in point of time to the date charged in the indictment.

Some of this improper evidence was detailed at length by girls who were not referred to in the indictment. Testimony was also given as to conversations between the defendant and others over a tapped telephone wire. Between May 28, 1934, and July 2, 1934, on nine different days, according to the testimony of a police officer, there were one hundred and seventy-five incoming telephone calls and fifty-nine outgoing. This testimony was admitted upon the statement of the police officer that he recognized the voice of the defendant, having heard him talk on three different occasions subsequent to May 28, 1934. The first time was on June 25, 1934, the second was on July third, and the third was in the latter part of the same year. These telephone conversations, if believed, would indicate quite conclusively that the defendant was acting as a booking agent for houses of ill fame. The language testified to was for the most part disgusting and revolting. While this evidence would not have been sufficient in and of itself to prove the commission of a crime or crimes, still it must have damned the defendant in the eyes of the jury in such a way that, even though it did not believe him guilty of the crime charged in the indictment, it would not permit him to escape.

Kay Rossi testified that, in November, 1934, while she was in a house of ill-fame on West Eighty-sixth street, Manhattan, she was introduced to the defendant by the woman who maintained the establishment, who said, " This is your boss, the fellow you are to work for." She stated that the defendant told her that he charged ten per cent for putting a girl in a house, and that if she worked for him she would have to pay ten per cent of her earnings, and the woman in charge would collect his share out of her earnings. She also told of the different houses in which she worked for him under the same arrangement. It was brought out by the assistant district attorney that she had been convicted of vagrancy in California and received a sentence of thirty days, and in Wichita, Kan., I " Got a year's floater, out of town." These convictions were had before this witness arrived in New York.

Mildred Gryscznski testified, in substance, that in 1935, while she was an inmate of the same house on West Eighty-sixth street, Manhattan, the same woman introduced her to the defendant " as her man and my boss, and she asked me if I understood about the 10% commission and different things. I said I understood about these things." She testified, also, as to the different houses in which she plied her trade, and that she paid the defendant his share of the proceeds. Prior. to the time she was taken into custody as a material witness in this case, she had been a drug addict. It appears that in 1932 she was sent to the House of Good Shepherd as a wayward minor by a magistrate. There she was confined for a period of fourteen months. Shortly after her release she entered various bawdy houses. Subsequent thereto, according to her testimony, she first became acquainted with the defendant in January, 1935.

We are of the opinion that the court erred in admitting into evidence the testimony as to the telephone conversations referred to, and also that of Kay Rossi and Mildred Gryscznski. In *People* v. *Molineux* (168 N. Y. 264), Judge WERNER said: " The general rule of evidence applicable to criminal trials is that the State cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged." Quoting from the case of *Commonwealth* v. *Jackson* (132 Mass. 16), he stated: " The highest court of Massachusetts has said: ' The objections to the admission of evidence as to other transactions, whether amounting to indictable crimes or not, are very apparent. Such evidence compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the

attention of the jury from the one immediately before it, and by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him.' ''

There are certain exceptions to the rule.

'' Generally speaking,'' said Judge WERNER, '' evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the com-- mission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial.''

The defendant was not charged in the indictment with being a low-lived scoundrel who depended upon the earnings of prosti- tutes in general for a livelihood; neither was he indicted for being a so-called booking agent. The reason for that is that there is no provision of our Penal Law which designates or defines such a course of conduct as a crime. He was simply accused, as we have seen, of sharing in the proceeds of prostitution of one Beverly Reynolds.

It is indeed difficult to understand how evidence as to subsequent offenses in a case of this character is necessary or proper to prove either motive or intent on the part of the defendant in the alleged commission of the offenses set forth in the indictment. If the defendant committed the acts charged, it would be quite clear that in so doing he would not only have an evil motive, but, in addition thereto, a willful intent. The motive would be to obtain ill-gotten money; the intent would be inferred from the very nature of the act. There are certain cases where it is proper, and even necessary, to establish a criminal intent by proving other offenses. As Judge WERNER said: '' Familiar illustrations of the latter rule are to be found in cases of passing counterfeit money, forgery, receiving stolen property and obtaining money under false pretenses. An innocent man may, in a single instance, pass a counterfeit coin or bill. Therefore, intent is of the essence of the crime, and previous offenses of a similar character by the same person may be proved to show intent. * * * So in a case where the defendant is charged with having received stolen property, guilty knowledge is the gravamen of the offense and scienter may be proven by other previous similar acts. * * * In cases of alleged forgery of checks, etc., evidence is admissible to show that at or near the same time that the instrument described in the indictment was forged or uttered the defendant had passed, or had in his possession, similar forged instruments, as it tends to

prove intent. * * * It will be seen that the crimes referred to under this head constitute distinct classes in which the intent is not to be inferred from the commission of the act and in which proof of intent is often unobtainable except by evidence of successive repetitions of the act."

It has been well and truly said by Mr. Justice BREWER in *State v. Adams* (20 Kan. 311, 319); that " A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."

Thus, by way of illustration, if A was charged with murdering D for the purpose of collecting insurance on D's life, the prosecution would have the right to show that in order to accomplish his purpose he murdered B and C who also were beneficiaries. Those facts would be relevant to indicate a common plan or scheme on the part of the actor to obtain the result which he desired. Many and more apt illustrations of the exceptions to the general rule are to be found in the cases collated in the opinion of Judge WERNER under the heading of a common plan or scheme.

If we are to sanction evidence as to subsequent offenses of the type introduced in this case for the purpose of proving a common plan or scheme, we must do violence to the salutary rule which was expressed and illustrated in the *Molineux* case. One might just as well contend that in a robbery case the People would have the right, as part of the direct case, to offer evidence of separate and distinct offenses committed by the accused in different localities and on different dates, on the theory that he had a common plan or scheme in mind to obtain other people's property by the use of illegal means. The same idea could be applied to a pickpocket, yet, it is well understood that evidence of that type would not be admissible. The reason for the rule is well expressed by Judge O'BRIEN in his concurring opinion in the *Molineux* case, as follows: " If the party suspected committed a similar crime before by the same or similar means, or a series of such crimes, proof of these facts goes far to establish his guilt in the popular mind of the offense charged and for which he is on trial; and yet nothing is better established than the rule that the vicious character of a person on trial for a specific offense cannot be shown, unless he himself makes his character or the events of his life a subject of inquiry by becoming a witness in the case. No matter how notorious a criminal the party on trial may be, neither his general reputation nor other specific offenses can legally be proven against him as evidence of his guilt of the offense charged. That such proof is persuasive and has great influence when introduced, upon courts and juries, cannot be doubted; but the law does not permit

it to be given upon the trial of an issue concerning the guilt or innocence of the party on trial for a specific offense. The reason is that such proof does not bear upon the issue in the case, and hence it is misleading, since it does not follow that a party who has committed one crime, or many, is guilty of some other crime for which he is on trial."

The same learned judge further said: " The rule of law that excludes the evidence for such a purpose may be, and probably is, contrary to the tendency of the human mind, but since the law was intended to curb the speculations of the mind and to guard the accused from the result of error in its operation, I am for maintaining the law in all its integrity and not for undermining it by qualifications that rest upon no reasonable or logical basis."

Our attention has been directed by the district attorney to the case of *People* v. *Fegelli* (163 App. Div. 576; affd., 214 N. Y. 670). An examination of the record in that case indicates that it is not in point. When evidence as to other offenses was offered, the attorney for the defendant said: " If your Honor will limit this evidence and limit the effect of it, so that the jury can only consider it as bearing upon the nature of the institution that was maintained there, then I do not object. This charge makes it necessary that the prosecution should establish that a disorderly house was maintained there, a house of prostitution, because the allegation is that the placing was in a house of prostitution. I admit that they have a right to prove that by this witness, and prove declarations of the defendant, and things done by the defendant to show that." After further discussion between the court and counsel, the court ruled: " We are trying him for placing Bessie Brown. I think I will limit you on the question and give the benefit to the defendant. Confine the inquiry to the character of this house."

While in some other jurisdictions there are authorities which seem to indicate that some evidence of the character under discussion may be admissible under certain circumstances, none have gone so far as to say that a wholesale attempt to prove other offenses, such as we have in this case, would meet with approval. The safer course is to follow the rules as to the admissibility of evidence, which have been laid down in this State.

We do not deem it necessary to set forth at length the other errors which indicate that this defendant was not accorded a fair trial. We will cite by way of illustration only one incident. During the cross-examination of Felix Justice, the court brought out the following testimony: " Q. You were examined by Mr. Pilatsky and gave him a statement? A. Yes. Q. And you were

put in the House of Detention? A. Yes. Q. If you were not put in the House of Detention, you would have been free to go your own way from the Penitentiary? A. I would have been. Q. He stopped you going away and put you in the House of Detention? A. I would not have left New York in any case, because I expected to go to work. Q. He would not take any chances? A. No. Q. You told him your story, and after he got your story he put you in the House of Detention? A. He did." Counsel for the defendant then asked the witness: " Q. Are you in the House of Detention now? A. Yes. Q. At the time you went to the County Penitentiary, there was a Federal case then pending against you, for forging money? Mr. Pilatsky: I object to that. The Court: Objection sustained. He knows that is incompetent. Mr. Siegel: I respectfully except. The Court: He was a Federal District Attorney himself and he knows that is incompetent, as well as anybody could know it. Objection sustained. Mr. Siegel: I respectfully except to your Honor's statement and ruling. That is all I can do and that I do. Q. Now, Mr. Witness, did you ask Mr. Pilatsky to do anything in your behalf concerning the case pending against you while you were in the House of Detention? Mr. Pilatsky: I object to that, I don't like that remark, Judge. The Court: If he wants to get nasty, you cannot help it. Objection sustained. Mr. Siegel: I am not being nasty."

The court then resumed: " Q. Were you promised anything by Mr. Pilatsky or anybody else? A. I was not. Q. With respect to your testimony in this case? A. I was made absolutely no promise whatsoever. Q. Do you expect any consideration, reward or promise? A. I do not. Q. Did Mr. Pilatsky promise to do anything for you or to do anything in your behalf provided you were a witness? A. He didn't promise me anything whatsoever. I served every day of my time. Q. Was your testimony either before Mr. Pilatsky in his office or in this court influenced in any way by any promise made to you by Mr. Pilatsky or anybody else? A. No, your Honor, nobody promised to do anything. I am not influenced in regard to anything in any shape or form whatsoever."

Counsel for the defendant continued: " Q. Did you ask Mr. Pilatsky to communicate with Mr. Gutman, the Assistant United States Attorney, in charge of the Federal prosecution against you for counterfeiting money? Mr. Pilatsky: I object to that. The Court: Objection sustained. Mr. Siegel: Exception. The Court: The jury will ignore that, and I insist that the lawyer is doing what he has no right to do, and I suspect he is doing it, so that he is telling it to you, and you must ignore it, whether he has told

it to you or not. He had no business to state it. He knows that he hadn't. Mr. Siegel: I except to your Honor's statement and ruling. The Court: But recollect, gentlemen, this should not reflect on his client. This chastisement of him — I am firm in that chastisement because I know that he ought to know better. Mr. Siegel: I except to your Honor's comment. That is all. Mr. Pilatsky: That is all."

The natural tendency was to divert the attention of the jury from admissions which might be deemed helpful to the accused. Of course, it is commendable for a judge presiding at a trial to ask questions in order to bring out the facts or to clarify the testimony; still, it seems to us that it was entirely unnecessary for the court to ask over thirteen hundred and fifty questions in a case involving a trial covering a few days, and also to make comments which were not only prejudicial to the defendant but also to the witnesses who were called by him. In *People* v. *Shenk* (181 App. Div. 753; affd., 228 N. Y. 574) Judge Smith said: " The burden of the appellants' complaint upon this appeal, however, is that the trial was so conducted by the court, both by his interference with the trial in asking many questions, and by the nature of the questions asked and his characterization of the evidence of the witnesses, that it amounted to a usurpation by the court of the functions of the jury, to the material prejudice of the defendants in the action. While the court in its charge to the jury stated that he had not intended to indicate in any way his opinion upon any question of fact in the case, or as to the credibility of any witnesses, the record indicates that whether intentional or not, the conduct of the trial is subject to grave criticism. It was stated by counsel and not contradicted that the trial judge himself asked over 1,200 questions, in an action wherein both the People and the defendants were represented by able counsel. An interference to this extent by the court with the trial of a case was clearly against the rules of proper procedure and fair play, and could not have existed without a clear indication to the jury as to the attitude taken by the court, both in respect to the merits of the case and to the credibility of the witnesses."

We realize that the charge contained in the indictment is a serious one. We also appreciate the fact that jurors who are selected to pass upon the guilt or innocence of the accused may be influenced readily by the attitude of the judge presiding at the trial. The mere charge, in and of itself, is almost sufficient to create a prejudice in the lay mind against the defendant. We may believe that the evidence adduced against him was sufficient to indicate his guilt beyond all reasonable doubt. However, guilty or innocent, he was entitled to a fair trial.

The judgment should be reversed and a new trial ordered.

O'MALLEY and UNTERMYER, JJ., concur; MARTIN, P. J., and DORE, J., dissent and vote for affirmance.

MARTIN, P. J. (dissenting). The defendant was indicted for a violation of subdivision 6 of section 2460 of the Penal Law, which reads in part: "Any person who shall knowingly receive any money or other valuable thing for or on account of procuring and placing in the custody of another person for immoral purposes any woman, with or without her consent, shall be guilty of a felony."

The guilt of the defendant was established beyond a reasonable doubt. Incidentally, it was shown that he had been engaged generally in the business of placing women in houses of prostitution. It is contended that evidence to prove that fact was improperly admitted because it proved crimes other than the one for which the defendant was indicted.

From the language of the statute it clearly appears that knowledge and intent are elements of the crime charged. The evidence of other placements was, therefore, admissible for the purpose of establishing guilty knowledge and criminal intent in placing the particular prostitute and receiving money from her and also to show a common plan, scheme or general design. (*People* v. *Molineux*, 168 N. Y. 264, 293.)

In *People* v. *Thau* (219 N. Y. 39, 42) the court, citing the case of *State* v. *Adams* (20 Kan. 311, 319), said: " And, on the other hand, it is equally clear that whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. A party cannot by multiplying his crimes diminish the volume of competent testimony against him."

In proof of the crime charged the People were properly permitted to show a system or general design from which a criminal intent and purpose might be inferred. Intent was clearly relevant to the issue and the evidence to prove intent was admissible.

In *People* v. *Grutz* (212 N. Y. 72, 77), it is said: " Evidence of other crimes is of course always admissible when such evidence tends directly to establish the particular crime; and evidence of other crimes is usually competent to prove the specific crime when it tends to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others."

In *State* v. *Schuman* (89 Wash. 9; 153 P. 1084, 1086) the correct rule is stated in language peculiarly applicable to the facts in the case at bar. The court said: " It is, of course, a general rule

that evidence of the commission of a separate and distinct crime is inadmissible to aid the conviction of a defendant for the crime charged. There are, however, exceptions to this rule as thoroughly established as the rule itself. Where the purpose is to show a system or general design from which a criminal intent or purpose may be inferred in the commission of the particular act charged, collateral offenses of the same character and perpetrated in the same way, though not otherwise connected, can always be put in evidence as tending to establish the system or design. * * * The similarity of the other offenses with that testified to by the prosecuting witness, the identity of the agreement with the appellant under which the money was paid by other prostitutes, and the identity in manner, place and amount of the payments, all had a direct tendency to prove a consistent general system, scheme or design evidencing a criminal intent and purpose."

The statute in question, Penal Law, section 2460 (Laws of 1910, chap. 618), when enacted was directed not against individual or isolated associations in connection with the vice in question but it was directed against the influential offenders whose business was gain through prostitution; its purpose was to reach the systemization of prostitution on a commercial basis. (*People* v. *Draper*, 169 App. Div. 479; *People* v. *Fegelli*, 163 id. 576.) The act is to be understood in connection with its history and purposes. In *People* v. *Fegelli* (*supra*) a correct statement of the aim and purposes of section 2460 appears in the following language:

" The first question is whether this division, made by inmates voluntarily in such a house, is the offense punishable by this statute, which appellant argues was aimed solely at the ' cadet ' or pimp, who subsists directly on a prostitute's earnings.

" In considering this question resort may be had to the investigation and reports made public in the last ten years, showing. the wide extent of commercialized prostitution. The evil of exploiting prostitution by taking toll of the wages of women who make themselves common, which by such incentives for profit tends to systematize and extend prostitution, had been the subject of detailed reports and strong denunciation. (The Social Evil, being the Report of Committee of Fifteen [2d ed. (1912)], 220; Kneeland's ' Commercialized Prostitution,' chapter 4; The Social Evil in N. Y. City, Report of Committee of Fourteen [1910], XXXIII.) These investigators pointed out that taking a percentage of the earnings of women engaged in prostitution was a leading cause of the growth and wide extent of this vice in cities, so that to stop such division of these wages of vice would be the first step toward reducing the evil. (See, also, Report of Vice Commission of Philadelphia [1913], 5, 15, 16.) * * *

" In the great centers of modern civilization a system of professional exploiters of this evil leads to that intensity of vice which has always been a mark of a rotten or declining civilization. All this was before the New York Legislature in 1910, which plainly intended by severe penalties to break up such an abhorrent traffic. * * * The Legislature intended to grapple with this evil by punishing men, or those higher up, and not stop with ineffective fining and imprisoning of the unfortunate inmates. But it was to meet more than the ' cadet ' evil. The measure was directed also against the larger and more influential offenders, whose business and stock in trade are gains through prostitution; whose commercialized methods might raise funds which become a constant source of corruption."

It is well settled in Federal jurisdiction that on the trial of an indictment for importing women for the purpose of prostitution evidence of other crimes is admissible. In *Kinser* v. *United States* (231 Fed. 856, at p. 860), the Circuit Court of Appeals (8th Cir.) said: " Without reference to whether the evidence was properly rebuttal or not, it is clearly admissible in chief, especially in view of defendant's contention that there was no evidence that his intention was that Mrs. Wilmott ' should engage in prostitution or other immoral practices.' The admissibility of evidence of other transactions showing intent has been fully considered by this court. *Withaup* v. *United States*, 127 Fed. 530; 62 C. C. A. 328; *Olson* v. *United States*, 133 Fed. 849; 67 C. C. A. 21; *Exchange Bank et al.* v. *Moss*, 149 Fed. 340; 79 C. C. A. 278; *Thomas* v. *United States*, 156 Fed. 897; 84 C. C. A. 477; 17 L. R. A. [N. S.] 720; *Schultz* v. *United States*, 200 Fed. 234; 118 C. C. A. 420. In view of these authorities it seems entirely a work of supererogation to cite those from elsewhere. Nor do we find anything in *People* v. *Molineux*, 168 N. Y. 264; 61 N. E. 286; 62 L. R. A. 193, in conflict with our previous rulings. In that case it is said: ' Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: * * * (2) intent; * * * (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others.' "

This is also the rule followed in New Jersey where proof on indictments under similar statutes is involved. (*State* v. *Mayewski*, 94 N. J. L. 491; 110 A. 906.)

As the defendant did not take the stand his character was not in issue and the People could not show mental or moral propensity or inclination in order to prove that he committed the crime charged. This established principle, however, has no bearing on the merits

of this appeal. The other transactions shown were adduced not to show general character, propensity or inclination but to show a general system or design from which the defendant's criminal intent and purpose could properly be inferred.

And even though the proof of the alleged other crimes or offenses would have been inconclusive to establish conviction for those specific acts as separate crimes, the People under the circumstances disclosed had the right to adduce such testimony and have it submitted to the jury (*People* v. *Dimick*, 107 N. Y. 13, 32). In that case the court said: " for the purpose of showing the motive and intent, it was competent for the People to show that the defendant had done other similar acts, although it might thus be shown that he was guilty of other crimes. (*Mayer* v. *People*, 80 N. Y. 364; *People* v. *Shulman*, Id. 373; *People* v. *Everhardt*, 104 id. 591.) The proof as to the other crimes may have been inconclusive, but the People had the right to give it and have it submitted to the jury with proper instructions for their consideration."

While it may have been unnecessary to receive the disgusting details of testimony to the effect that the defendant had persuaded a prostitute to ply her trade while she was sick, the testimony of the procurement being admissible, the defendant was not entitled to consideration with respect to the incidental details.

It may be that the court and its charge and the summation of the district attorney are open to criticism. Under the circumstances of this case, however, it would be against rather than in the interest of justice to reverse the judgment.

This court has found it necessary on several occasions to call the attention of trial judges to the proper procedure to be observed on the trial of criminal cases. If we should hold it necessary to reverse a judgment of conviction in every case where simple rules of practice have not been followed, even though defendant's guilt is established beyond any doubt, it is evident that many defendants who are clearly guilty would escape punishment. Courts and judges must not overlook the fact that the purpose of the trial of a criminal case is to ascertain the truth and determine whether a defendant is guilty of the crime and, if so, to punish him therefor, in an effort to protect society.

The testimony not only fully sustains the conviction, but it is clear that no other result could be justified. We believe in the interests of justice the conviction should be affirmed.

DORE, J., concurs.

Judgment reversed and a new trial ordered.