DELAWARE OYER AND TERMINER, September 1845. Before *Parker*, Circuit Judge, and *Wheeler, Hakes, Gregory* and *Jennings*, County Judges.

## THE PEOPLE *vs.* JOHN VAN STEENBURGH.

An offence, in regard to which there is a discretion vested in the court, to pun-
ish it, either by imprisonment in the state prison or by fine, or by imprison-
ment in the county jail, is within the statutory definition of felony. If the
offender, on conviction, be liable to imprisonment in the state prison, he is
guilty of felony, though he be also liable to the infliction of a less severe
punishment.

A violation of the seventh section of the act, entitled " an act to prevent per-
sons appearing disguised and armed," passed January 28, 1845, is a felony;
and the killing of a human being by persons engaged in the violation of that
section, though the act be perpetrated without any design to effect death, is
murder.

The prisoner was indicted for the murder of Osman N. Steele.
At the time of Steele's death, he was the under sheriff of the
county of Delaware, and was shot while engaged in the col-
lecting of rent, by some persons in a large assemblage of peo-
ple who had collected for the purpose of resisting the collection
of the rent, most of whom were armed and disguised. The
prisoner pleaded, to the indictment, not guilty.

It was proved on the trial that *Moses Earle* lived upon and
occupied a lease lot of 160 acres of land, in the town of Andes
in the county of Delaware, which he held under Charlotte E.
Verplanck at a rent of $32 a year. The rent was paid up to
the spring of 1843. Two years' rent being due in the spring
of 1845, the agent of the lessor applied to Earle for payment,
but it was not paid, and on the 4th of June, 1845, a distress
warrant, in due form, for the collection of $64 was issued and
and delivered to Osman N. Steele, to be executed by him as un-
der sheriff of the county of Delaware.

It was proved that a levy was made on sufficient personal
property, which was duly appraised and advertised for sale;
that Earle was urged to pay and refused; that on the 29th July,
for which day the sale was advertised, the sheriff offered the

property for sale and could get no bidders, though from forty
to fifty persons were present, and that the sale was postponed
for want of bidders till the 7th of August.  That on the day
last named, Green Moore, the sheriff, and Osman N. Steele, the
under sheriff, accompanied by Mr. Wright, the attorney for
the lessor, and Mr. Edgerton, who acted in their aid, went to
the place of sale on the leased premises; that Earle, when
again appealed to for payment, said, " You will have to go on
and make it out of the property.  I shall fight it out at the
hardest."

Peter P. Wright, one of the witnesses for the prosecution,
described the further occurrences of the day as follows:   Soon
afterwards six persons, armed and disguised as Indians, were
seen in the pasture lot on the southerly side of the road.   The
sheriff told the spectators to assist him in arresting them, but
it was not done and no attempt was made to arrest them.   A
few minutes afterwards, as many more persons similarly armed
and disguised were seen in the pasture lot, who entered the
woods at the same place.   Between ten and eleven o'clock, I
saw a company of disguised persons coming from the north side
of the road.   They crossed the road and went across the pasture
lot to the same place, and their chief commanded them to halt.
They did so, and turned around and looked at me, and their
chief cried " Tory " several times.   They then faced about and
returned and went to the north side of the road and passed near
me.   Some of them had their masks up.   I was anxious to learn
who they were and followed them up the hill.

At the same time, about 60 disguised persons came out of
the woods below the line, and formed in single file.   Their
chief was dressed in scarlet.   They entered the woods at the
same place as the others, which was the general place of ren-
dezvous.   It is said there is a spring at the place of rendezvous.
About noon they commenced coming out from this place in
single file, and formed in platoons, four deep, near the bars, and
then marched down the road and formed a line, as far as Earle's
house.   As they passed through the bars, I tried to count them.
I counted part and estimated the remainder.   I think there

were about one hundred. They faced to the north, fronting Earle's house. I then passed down along the front of the line towards Earle's house. These men were armed and disguised as Indians — masked, so as not to be distinguished. I went down to about the centre of the line and met the commander-in-chief. He was telling the spectators to stand back — that they wanted the ground. He told me to stand back twenty feet. I told him I should not stand back twenty feet, nor one inch for him, or any of his tribe. He had a broad sword in his hand, and he then placed it flat against my breast and told me to stand back. I then put my hand on the handle of a pistol in my breast pocket, and told him to withdraw his sword from my person instantly, or I would make a hole through him. He then dropped his sword and took it in the other hand, drew up his dress and drew a pistol from his pantaloons pocket, and presented it and said, "I have a pistol as well as you," and said, "do you draw a pistol upon me?" I said I had drawn none on him, but if he violated my person again, I should defend myself as long as I had power to do it — that I did not come there to get into any quarrel. I told him that he was violating the law as well as the rest of his tribe, and they were liable to be punished in state prison, and they all knew it. One of the Indians in the line said, "damn the law; we mean to break it."

The commander-in-chief had a scarlet dress — black cap, something like a chapeau, and a red mask made of cloth that set very close to his face. I told him I knew him. He said "No you don't," I said, "Yes I do, and I shall remember you too." He said "You can't swear to me," and he turned and left me standing there. Pretty soon he came back and ran against me intentionally, as I supposed. I paid no attention to that. Then the Indians in the line commenced blackguarding me, and asked me if I came there to bid upon the property. I told them, if the property was offered for sale, I should bid on it. They then said, that if I bid on the property, I should go home feet foremost in a wagon. One of them wanted the chief

to order him to throw me over the stone wall, and said it would be done very quick.

Just before Steele and Edgerton came up, there was a horn blowed by some one in the line of Indians. Wher Steele and Edgerton came to the lower end of the line, the chief commanded the Indians to march up to the stone wall and they did so, and faced about and Steele and Edgerton rode by. We then had an interview, and the sheriff announced we would proceed with the sale, and he started and requested some one to go with him. John Burr and another person went with him into the pasture lot, to assist him to drive up the cattle levied on. The commander-in-chief then said, he wanted twelve volunteers to accompany the sheriff and prevent his selling the property in the lot. They came out from the east end of the line and went through the bars, and the chief counted them off. Shortly after, he called for more volunteers, who also went. The sheriff drove the cattle up near the bars, but he had some difficulty in doing so. The whole body of Indians then moved up the road and through the bars, and formed a hollow square around the bars. Steele and Edgerton took their position near the bars, and I was between them. We were facing south and Edgerton was on my right. I was on foot and Edgerton and Steele were on horseback. The sheriff was trying to drive the property into the road. A person named Brisbane came up, and said we had no right to sell in the road, because the advertisement said, " on the premises." Brisbane was in disguise. Steele and Edgerton then rode down the road to read the advertisement at the barn. Some of the Indians came out of the lot, across the road, over the fence, and went in a westerly direction. Steele and Edgerton returned to the bars and the Indians went back into the lot. We took our positions as before. Then I talked with Steele and Edgerton, about adjourning the sale. We thought it was best to offer one article. Steele told me to stand between him and Edgerton and they would protect me if I wished to bid on the property. We remained a few moments and I called the sheriff out and told him, unless the Indians would permit hir

The People *v.* Van Steenburgh.

to get the property into the road, he might adjourn the sale. He went back into the lot and said he thought he should be able to get them to consent to it. The sheriff took his position a little to our right — fifteen or twenty feet distant. At this time, there was a platoon of Indians guarding the bars, to prevent people entering the lot. I then asked permission to pass into the lot. I wanted to see the sheriff and they forbade my passing in. I told the.:: I should go in and they said I should not. I stepped up again, and a man put up his gun perpendicularly. I put up my cane and forced a passage through into the lot. They huddled up around me and Steele and Edgerton rode in immediately. They came up side of me. The platoon of Indians at the bars fell back as they passed, and I advanced. They rode in, twenty or thirty feet. After they had got in about a rod, the command was given to shoot the horses. The horses were six or eight feet apart, and I was in the middle, a little in advance. "Shoot the horses" was spoken by several; · can't be certain the chief started it; I think it was repeated as many as three times. Edgerton in a loud voice said, "I command all persons present to assist in preserving the peace." Edgerton was a constable. I think his horse was about stationary at that time. The Indians formed a circle or semicircle about us. I saw an Indian on the right, six or eight feet from Edgerton's horse, pointing his gun at the right breast of the horse; — the discharge took effect and I saw the blood flow out freely; — three or four guns were then fired in quick succession. Some of them said "shoot him" or "shoot 'em." It was repeated more than once. Edgerton's horse reared up and plunged and turned to the left. So did Steele's horse. While they were passing around that way, there was a volley of twelve or fifteen guns discharged among us. This was just after the words "shoot 'em," a few seconds after the others had been fired. I stepped back towards the bars while this second volley was fired, and I saw Steele falling towards the right, near the rail fence, fifteen or twenty feet above the bars. His horse did not fall, but turned towards the left. His horse passed down and stumbled and fell. Edgerton's horse stumbled

and Edgerton got off and the horse fell near Steele. Sheriff More, Edgerton and myself run up to Steele. More said, "For God's sake, you have done enough — desist." I think the firing continued after Steele commenced falling. We ran up and took hold of him, and asked him how bad he was wounded, and he said his bowels were all shot to pieces — that there were two bullets in him and he could not live but a few minutes. This was about half past two o'clock. The sheriff, Edgerton and myself carried him through the bars, and then Doct. Calhoun came to our assistance in the road, and we carried him down to the shade of the barn, where Steele requested us to lay him down a moment. Then Brisbane joined us, and we carried him into Earle's house and laid him on the bed. Doct. Calhoun and all of us examined his wounds, and found he was mortally wounded. One bullet went into the breast and out near the right shoulder. One entered on the back — the mortal wound — and came out on the right side, and one through the right arm. He died at fitfeen minutes past eight on that night.

There was further evidence, tending to show that the Indians made threats against Steele before he entered the bars and that Steele made no reply. It was also proved that Steele was armed with a pistol, but that, if he fired it, it was not till after from three to five shots had been fired. He was then seen trying to raise his right arm with the help of his left hand, with the pistol in his right hand. It was also proved, that some of the Indians broke and run as soon as the firing commenced or very soon after, and that the whole number of Indians present was about one hundred and fifty.

It was proved that the prisoner was one of the disguised persons present upon that occasion; and that he was armed with a rifle, and that when the disguised persons were returning home on that day, after Steele was shot, one of the disguised persons whom the evidence tended strongly to prove to be the prisoner, said, speaking of Steele's being shot, " that it was good enough for him and that he got what he ought to have."

One of the witnesses testified that about fifteen minutes after the firing, he heard the prisoner inquiring for a small ram rod, to enable him to reload his rifle. But the witness who testified admitted he was one of the disguised men and there was evidence impeaching his general character. There was also evidence tending to show that the prisoner's gun was discharged by him on his way to the place of rendezvous.

*S. Gordon* and *S. Bowne,* for the prisoner, cited 2 *R. S.* 546, 587; 6 *Wend.* 277; 4 *Black. Com.* 95, 104; 1 *Cow. & Hill's notes,* 64; *People* v. *Ward,* 3 *Hill,* 397; *Roscoe Cr. Ev.* 567.

*J. B. Steele* and *S. Sherwood,* for the people, cited *Russ. on Cr.* 447, 451, 454; *Starkie Ev.* 3; *Barbour Cr. L.* 258; *Statutes of* 1845, *Ch.* 3

PARKER, Presiding Judge, among other things, charged, that the offence of being armed and disguised, while engaged in a riot or in resisting the execution of legal process, as described in the seventh section of the act entitled an act to prevent persons being disguised and armed, passed January, 28, 1845 (*Sess. Laws of* 1845, *page* 7), was a felony, and brought the offender within the definition of murder in the third subdivision of the *5th Section, Title* 1, *Chap.* 1, *Part* 4 *of the Revised Statutes,* if the killing of a human being was perpetrated without a design to effect death by a person engaged in the commission of such offence; to which portion of the charge the prisoner's counsel excepted.

The prisoner's counsel contended that the offence created by the act of 1845, was not a felony, because its commission was not necessarily to be punished by imprisonment in the state prison, but might be punished by fine and imprisonment in a county jail. But the court held that the offence was felony, because it was liable by law to be punished by imprisonment n a state prison, and that it was none the less felony, because .t was also liable to be punished by some milder punishment,

the statute definition of felony, in this state, being, "an offence, for which the offender, on conviction, shall be liable by law to be punished by death or imprisonment in the state prison" (2 R. S. 702).

And the court charged the jury, that if they were satisfied from the evidence, that the armed and disguised persons mentioned, by the witnesses, had assembled for the purpose of preventing a sale of the property levied on under the landlord's warrant, either by force or by intimidation, and in the furtherance of that object some of them shot at the horses of Steele and Edgerton, though such shots were fired with the intention of killing the horses and not of killing Steele, yet if Steele was killed by such shots, the crime committed was murder, for which act each one of the armed and disguised persons so assembled was responsible.

The jury found the prisoner guilty of murder, and he was sentenced by the court to be executed on Saturday the 29th day of November, 1845.(a)

(a) A statement of the conviction, sentence and testimony in this case having been transmitted by the presiding judge to the Governor, pursuant to the requirement of the Revised Statutes (2 R. S. 658, § 13), the latter submitted the case to the justices of the Supreme Court of the State, who concurred in the correctness of the decisions of the legal questions which arose on the trial.

At the same Court of Oyer and Terminer, Edward O'Connor was also tried and convicted of the murder of Steele and sentenced to be executed at the same time with Van Steenburgh. Moses Earle, and Daniel W. Squires, Daniel Northrop and Zera Preston were convicted of manslaughter in the first degree, and sentenced to imprisonment in the state prison for life. Calvin Madison was convicted of manslaughter in the first degree, and sentenced to imprisonment in the state prison for ten years. John Phoenix, Isaac L. Burhans, John Burch, William Reside and John Latham, were convicted of manslaughter in the first degree, and sentenced to imprisonment in the state prison for seven years. William Brisbane was convicted of manslaughter in the second degee, and sentenced to seven years' imprisonment. William Jocelyn was convicted of manslaughter in the fourth degree, and sentenced to two years' imprisonment. Charles T. McCumber was convicted of robbery in the second degree, and sentenced to seven years' imprisonment.

At the same court, fines, ranging from $25 to $500, and amounting in the aggregate to $2150, were imposed upon the following named persons, convicted of conspiracy, or of having, on some occasion, been unlawfully disguised and armed, in violation of the act of 1845. Harvey Hubbell, Richard Halcott

SUPREME COURT. At Chambers, New York, March, 1845.
Before *Edmonds,* Circuit Judge.

John M. Bardsley, George Lynde, Abel A. Fuller, John Lockwood, Nathan Travis, David T. Scudder, James Barnhart, William Bryant, Chauncey P. Wolcott, Miles Bromley, John O. Liddle, Andrew Liddle, Homer Bergen, Levi Jenkins, James A. Mills, Homer Sandford, Cantine Connelly, Robert Rutherford, Archibald McNair, John Oliver, Lewis Delamater, Levi Sanford, John Davis, Robert Scott.

As to the following persons, who pleaded guilty, sentence was suspended. Augustus Kittle, James Clayton, Smith Sanford, Edwin Mason, Barber Stafford, Henry L. Russell, Zadok P. Northrop, John Wilson, Jr., William Ferdon, James Hayes, Alonzo Sanford.

Al of the convictions mentioned in this note were for offences committed in resisting the collection of rents. It is due to the character of the people of Delaware County to say that since such convictions, no instance of an illegal resistance to the execution of process has occurred in that county.