33   623
18ap150

# THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, *v.* JAMES S. LYON, APPELLANT.

*Wrongful conversion of public funds — 1875, chap. 19 — when one member of a firm may be convicted under it, though he was absent from the State when the money was received and had no knowledge of it—felony and misdemeanor—the common-law distinction between, is not wholly abolished in this State — 2 R. S., 702, sec. 30 — to what cases the definition of felony there given applies.*

The defendant was indicted, under chapter 19 of 1875, and convicted of receiving and converting to his own use on September 14, 1875, the sum of $2,200 owned by the city of Buffalo with intent to defraud that city. It was shown upon the trial that for several years prior to the day stated the defendant had been engaged in carrying on business in the city of Buffalo with one Bork. That they had carried on the real-estate business under the firm name of Lyon, Baker & Co., and subsequently under that of Lyon, Bork & Co., and had carried on the banking business under the name of Lyon & Co. The two firms had a common office and common clerks, but separate desks and books. Bork became the treasurer of the city of Buffalo in February, 1872, and continued to hold that office until December 31, 1875, when he was suspended by the mayor. On September 13, 1875, the sum of $2,200 in currency belonging to the city was taken from its treasury by the firm of Lyon & Co., and appropriated and used by that firm in and for the purposes of its business, and the said sum was not repaid to the city. At the time this was done the defendant was not in the city of Buffalo, but was in Utah Territory, and had been there for some weeks, and he had no personal knowledge of the transaction at that time. It did not appear that the defendant had been at any time in the office of the city treasurer while Bork was city treasurer, or that he personally took or received any money that came from there; but it was shown that he was in full vigor of manhood, had a large business experience, and that when in the city he was daily at the firm's office attending to business and looking after its interests.

*Held,* that to render the wrongful taking and receipt of the said money by the firm the act of the defendant, it was necessary for the people to show that it was done by his direction, or pursuant to some understanding to which he was a party.

That to establish this fact the prosecutor might offer evidence to show that there had been an arrangement made by or between him and Bork to take the moneys of the city from its treasury for the purposes of the business of the two firms, from time to time as they should require them; that they had adopted that as a system for supplying the firms with funds.

That the fact that the firms were at the time Bork was suspended indebted to the city in a sum exceeding $400,000, and had been largely indebted for several years prior thereto, and that it appeared from the books kept by the firms that large amounts of the moneys of the city had been repeatedly received by the two firms and were used for the purposes of their business, were admissible to show that a combination existed between the defendant and Bork, and knowledge by the defendant of such wrongful acts.

That when sufficient evidence had been given to justify the inference that such a combination or conspiracy had been entered into between the defendant and Bork, that then the acts and statements of the latter in aid and furtherance of that common purpose were admissible as against the defendant.

That such acts, and statements made by Bork to the defendant informing him of what had been and was being done, were competent as bearing upon the question of the defendant's knowledge and of his motive and intent.

The act under which the defendant was indicted and convicted (chap. 19 of 1875) provided that any person committing the offense with which the defendant was charged should " be punished by imprisonment in a State prison for a term not less than three years or more than ten years, or by a fine not exceeding five times the loss resulting from the fraudulent act or acts which he shall have so committed, aided or abetted,  *   *   *   or by both such imprisonment and fine." The prisoner's counsel requested the court to direct a verdict for the defendant upon the ground that the offense with which the defendant was charged was a felony, and that as he was indicted as a principal he could not be convicted as it was shown that he was not actually or constructively present when the money was taken, aiding and abetting in the commission of the offense.

*Held,* that the request was properly denied, as the offense for which the defendant was convicted was, within the meaning of that term in the rule referred to, not a felony but a misdemeanor.

Section 30 of 2 Revised Statutes, 702, providing that " the term felony when used in this act, or in any other statute, shall be construed to mean an offense for which the offender on conviction shall be liable to be punished by death, or by imprisonment in a State prison," does not in terms or by fair implication declare that every offense punishable by imprisonment in a State prison is a felony, nor does it assume to define or apply the meaning of that term otherwise than when used in a statute. (Per BRADLEY, J.)

The common-law distinction between a felony and a misdemeanor, to quite an extent, still exists in this State. (Per BRADLEY, J.)

Appeal by the defendant from a judgment of conviction, rendered at the Erie Oyer and Terminer, and from an order denying the defendant's motion for a new trial.

*F. Brundage*, for the appellant.

*Edward W. Hatch*, district attorney, for the respondent.

Bradley, J. :

The defendant, by indictment found against him at the Erie Court of Sessions, in November, 1877, was charged with receiving, converting, etc., $2,200 owned by the city of Buffalo, with intent to defraud that city, on the 14th day of September, 1875.

This presentment was made pursuant to chapter 19, Laws of 1875, which provides that " every person who, with intent to defraud, shall wrongfully obtain, receive, convert, pay out or dispose of, or who with like intent by willfully paying, allowing or auditing any false or unjust claim, or in any other manner or way whatever, shall aid or abet any other in wrongfully obtaining, receiving, converting, paying out or disposing of any money, funds, credits, or property held or owned by this State, or held or owned officially or otherwise for or on behalf of any public or governmental interest by any municipal or other public corporation, board, officer, agency, or agent of any city, county, town, village or civil division, subdivision, department or portion of this State shall, on conviction of such offense, be punished by imprisonment in a State prison for a term not less than three years or more than ten years, or by a fine not exceeding five times the loss resulting from the fraudulent act or acts which he shall have so committed, aided or abetted,    *    *    *    or by both such imprisonment and fine." He was found guilty, and by the judgment of the court sentenced to four years' imprisonment in the State prison at Auburn. He brings this appeal and in his behalf it is contended that errors to his prejudice were committed at the trial. It appears that in 1852 the defendant engaged in the real estate business, so-called, in the city of Buffalo.

In 1857 Joseph Bork as clerk went into the service of the defendant, and one Baker who was then associated with him in the business, and in 1866 Bork became a member of the firm then known as Lyon, Baker & Co. In 1870 they formed another company having

the firm name of Lyon & Co., cc⁻isisting of Lyon, Bork and one Wright, for the purpose of banking business. These two firms occupied the same room and had clerks common to both, kept separate sets of books, and occupied different desks. Early in the year 1872 Wright went out of the latter firm, and about the first of February that year Bork's interest became one-third in both firms, which were composed of the same persons, and continued so until the 1st of February, 1874, when Baker sold out his interest to Westcott and McManus, and the name of the firm of Lyon, Baker & Co., was changed to that of Lyon, Bork & Co., and the business of both firms was carried on until the last of December 1875, when it was quite abruptly terminated. Bork on 6th day of February, 1872, was elected treasurer of the city of Buffalo, qualified, and entered upon the duties of the office about the fifteenth of the month. Was re-elected in November, 1874, for the term of two years from the first Monday of January following. He entered upon this term of his office in January, 1875, and continued to act as such until he was by the mayor of the city suspended from office on the 31st day of December, 1875.

Prior and up to about the time of the election of Bork, in 1872, there had been an officer of the city known as receiver of taxes, which office was abolished, and thereafter the duties of it were vested in the treasurer of the city, and when Bork went into office, in 1872, he made that business a department in his office, and one Werrick cashier in that department. Bork was engaged in the business of the two firms, and soon financial relation was created and carried on to quite a large extent between the treasurer's office and the two firms in a manner which will hereafter be briefly mentioned. The jury were authorized to find, and necessarily did find, that on the 13th day of September, 1875, the sum of $2,200 in currency belonging to the city was taken from its treasury by and to the firm of Lyon & Co., and appropriated and used by that firm in and for the purposes of its business, and was not repaid to the city. Bork on the day following (fourteenth September) drew his check for that amount on Lyon & Co., which was never presented for payment nor paid, but was left and remained in the city treasurer's office. The testimony tends to show that somebody went from the office of the firm after and obtained the money in question

for the firm. It does not appear what particular person did it, but it is evident that it was done by the personal direction or authority of Bork or by him. He says his recollection is "that the $2,200 was borrowed on the thirteenth of September at the treasurer's office by some one from Lyon & Co's. office." The defendant was not then in the city and had no personal knowledge of this transaction at that time. To charge him with the offense, evidence of transactions and circumstances extending through the entire period from the time Bork became city treasurer was given, which developed a remarkable history of peculation bearing directly on Bork as such treasurer, and by which was taken and diverted from the city treasury upwards of $400,000.

This evidence tended to show and justified the conclusion that while the firm of Lyon, Baker & Co., and the members of it, had some property, the banking firm of Lyon & Co. was not supplied with any capital by the members, but its disbursements were dependent upon moneys received in the course of its business from other sources; that it did considerable business, and from time to time as necessity required currency was taken from the city treasury and used by the firm for its purposes, some of which was repaid, but during the period of nearly four years money so taken from the treasury and not repaid amounted to about $50,000; that the firm of Lyon, Baker & Co., and Lyon, Bork, & Co., doing a real estate and insurance business, represented a large number of property owners, residents and non-residents of the city, whose interests in that respect they looked after, collected rents, paid taxes, etc., and for such disbursements for some of them the firm did receive rents, and from others of them obtained money; that when the payment of city taxes was required in each of the years 1872, 1873, 1874 and 1875, instead of paying the amount of the taxes for them into the city treasury, the firm, through the aid of Bork, the treasurer, caused those taxes to be marked off the list as paid, had them receipted, charged the amount to those persons assessed, made checks in name of Lyon, Baker & Co., and Lyon, Bork & Co., on Lyon & Co., for the amounts which were taken by Bork, and the money used in the business of the firms.

Those checks were never presented for payment nor was the money paid into the treasury. The taxes thus disposed of included

those of the firm and its members on their property, and amounted to over $60,000 in 1872, $27,000 in 1873, and upwards of $117,000 in 1874, and something more than $25,000 in 1875 ; that the facilities to obtain money for the treasury was greatly increased by the issue of bonds during those years by the city pursuant to statutes for various purposes, and a large amount of them was in fact so issued. Bork, as treasurer, had charge to some extent of the negotiation of them, and did sell a large amount of those bonds in New York city aided by agencies there, and by his direction some of the proceeds from time to time were there placed to the credit of the firm of Lyon & Co., with the banking correspondents of the firm, and drawn out by it and used for the purposes of its business, and some of the bonds were purchased by Lyon, Baker & Co. of the comptroller of the city of Buffalo, and paid for by the check of that firm on Lyon & Co., taken and retained by Bork as treasurer, and the bonds so purchased used by the firm as security for loans of money, which moneys were used by it in its business, and the checks were never presented for payment nor paid, nor were the amounts of proceeds of bonds so credited to and drawn out and used by the firm ever paid into the treasury. The amount realized and appropriated by the firm from the proceeds of the city bonds was large, and the evidence tends to show that it exceeded $100,000.

This is but a brief summary of the system used to take and divert moneys from the treasury of the city by these firms for their business purposes. While they did not have the most approved method of keeping accounts, some of these transactions were sufficiently spread on the books and memoranda of the firm to show something of many of them, and from which, aided by other circumstances, information might be derived that their liabilities to the city of Buffalo were large. Those transactions were largely represented by four accounts appearing on the books of the firms and designated as " Teller's Check Account," " Deposit Account," " Joseph Bork, Individual Account," and " Lyon & Co.'s Account," which were explained on the trial as showing liabilities to the city of $384,000, and with an additional account relating to such liabilities they were increased in amount to upwards of $400,000 at the close of business in December, 1875. It is unnecessary here to refer more particularly to the system of keeping the designated

accounts than to add that the "teller's check account," so far as related to the matters in question, represented checks issued by the teller of the banking firm of Lyon & Co. to Bork, on account of moneys which came to it through him, and in some instances when he had given his check to obtain the benefit of money for this firm. The proceeds of city bonds which he caused to be credited to Lyon & Co. constituted a large portion of the amount for which teller checks were so issued. The amounts would be credited to him and the teller's check issued. Those matters in this account went into no other account on the books of the firm. These teller's checks were kept in drawer in the office of Lyon, Baker & Co., and Lyon, Bork & Co., and when their business was closed those checks were found there, and the liability of that account appearing on the books was $98,316. There was another, sometimes called the "margin-book account," upon which entries were made daily of such cash items as went into the accounts on the books. And the firm also kept a memorandum slip upon which entries were made of moneys which did not go on to the books. Upon this slip the evidence tends to show that some of the amounts taken from the city treasury for temporary relief were entered, and that it contained the necessary information of the sources from which the sums there entered as received came. This slip was kept in the money drawer.

The accounts of the defendant with the firms showed him quite largely in arrears. The evidence tends to show that early in 1872 the defendant commenced to overdraw his account with Lyon, Baker & Co., and continued to do so; that on 1st February, 1874, his over-drafts were $25,000; on 1st February, 1875, $27,000, and on 30th December, 1875, $52,000, but this included moneys drawn for which he was responsible in addition to his individual over-drafts, and that not allowing him credits for profit during the four years the over-drafts would amount to $80,000, and that his over-drafts after the 17th February, 1875, including those sums drawn during that time which he was liable to pay, amounted to upwards of $25,000; that while the books of Lyon & Co. showed a balance due Lyon, Baker & Co., and Lyon, Bork & Co. (which were treated as one firm), the checks drawn by the latter firms on Lyon & Co., and held by Bork in the city treasury, exceeded that balance over $144,000 when the business closed in December, 1875; that the

estimated indebtedness of the firms to the city in 1873 was $150,000, and in September, 1875, nearly $320,000, and the entire liabilities of the firms then $460,000 ; that at the termination of their business in December, 1875, the entire liabilities ot the two firms, as appeared by their books, amounted to upwards of $660,000, and that the amount of money they then had on hand was $757.26. It also appears that at times Lyon & Co. had overdrawn their accounts with their correspondents in the city of New York, and especially was that quite largely so in the months of June, July, August and September, 1875, without means of their own to take care of their account, and the proceeds of city bonds sold were to quite an extent used to rescue them from default there. And that of the $2,200 in question, $2,000 was sent to New York on 13th September, 1875, for a like purpose.

This is a general outline of the situation and transactions of the firms of which the defendant was a member, deducible from the testimony (which the jury were authorized to find), so far as may be material for consideration.

The learned counsel for the defendant, by various exceptions taken on the trial, raised the questions and insisted there, and contends here, that the evidence was insufficient to charge the defendant with the offense alleged, in the indictment, and did not present any question for the jury, and that the testimony relating to the several transactions and situation of the firms, and of Bork as a member of them, not bearing directly upon the facts in relation to the $2,200 in question was incompetent.

The charge against the defendant is the receiving and converting the $2,200 with intent to defraud, etc., and no evidence was competent that did not bear legitimately in some degree on the question of his guilt or innocence of that offense.

Abstractly considered evidence tending to show that he was or might be chargeable with any other crime than that charged in the indictment was not admissible. The alleged offense was committed, if at all, at the time the $2,200 was received and appropriated and at no other time. The defendant was then in Utah Territory and had been for some weeks, and to make the act his it was necessary for the people to show that it was done by his direction or pursuant to some understanding to which he was a party, and by such

understanding, combination or conspiracy, as to charge him with criminal intent. He was a member of the firm which received and applied the money to its business purposes. Some member of the firm had personal knowledge where the money came from and had the purpose of taking and using it. The defendant did not personally know anything about that particular transaction. The prosecution had the right to give evidence tending to show that there had been an arrangement made by or between him and Bork, to take from the treasury of the city of its money for the purposes of their firm business from time to time as they should require; that they had adopted that as a system for supply of currency, and it was proper to present by evidence circumstances which tended in that direction, and when sufficient appeared to justify the inference of such a combination or conspiracy between the defendant and Bork, then evidence of the transactions of the latter in aid and furtherance of that common purpose was competent. Having given evidence tending to prove that from time to time from February, 1872, and quite frequently, money of the city had been taken to and used by the firms, the people were justified in the effort to show that it was done with the knowledge and consent of the defendant with a view to the establishment of a purpose on his part, in common with that of Bork, to make the relation of the latter to the city treasury available as a means of supply. This legitimately led to inquiry into the manner of keeping accounts by the firms, and somewhat of their business transactions and financial condition. It did not appear that the defendant was at any time in the office of the city treasury during the entire period, or that he personally did any act of taking or receiving any money that came from there, but it did appear that he was in full vigor of manhood, had a large business experience, and when in the city was daily at the firms' office attending to business and looking after its interests, and it might be inferred that he had some knowledge on the subject derived from the books and memoranda of the firms and other circumstances. Then there is evidence tending to prove conversations between him and Bork (which if true) could not fail to show that he had knowledge of those transactions, and the manner in which supplies for the firms came from the money of the city.

Those conversations were had in each of the years 1872, 1873,

1874 and 1875, one of which, of 1872, was in effect an understanding that Bork as treasurer should hold the checks of Lyon, Baker & Co. for the amount of city taxes of the principals or clients of the firm, as well as the amount of its taxes and those of its members, so as to enable it to have the use of the money in its business, which method was adopted; that on other subsequent years as before mentioned, and in a conversation of 1873, between them, reference was made by Bork to the fact that they then owed the city treasury $15,000, in such manner as to convey such information.

It is not necessary here to refer to the circumstances in detail which tend to establish knowledge on the part of defendant. But the testimony was such as to authorize the jury to find, that the defendant was well advised of the transactions of receiving and using the money of the city by the firms in their business, and that this was so frequent and continuous during the period of nearly four years, and of such magnitude as to justify the conclusion, that it was adopted as a business system for the firms, with the understanding and purpose common to the defendant and Bork that it should be done and continued for financial relief of their firms when required. The methods were entirely consistent with such purpose.

The various transactions and circumstances extending through the time of the existence of these firms, subsequent to February, 1872, were not given upon the trial to prove that the $2,200 was taken and used in September, 1875, nor in the least to bear upon that fact, which must be established or fail upon the proof relating to it alone; but were shown as bearing upon the question of knowledge and intent. The intent of the defendant to defraud was a necessary ingredient to constitute the alleged crime. Those facts and circumstances proved were not independent collateral transactions (such facts are not admissible), but they were associated transaction,s facts and circumstances relating to knowledge and purpose, and to afford light guiding to motive and intent. Such evidence was properly received. (*People* v. *Wood*, 3 Park. Crim. R., 681; *Bielschofsky* v. *People*, 3 Hun, 40; affirmed, 60 N. Y., 616; *Coleman* v. *People*, 58 id., 555, 560; *Weyman* v. *People*, 4 Hun, 512; affirmed, 62 N. Y., 623; *Pierson* v. *People* 79 id., 424; affirming, 18 Hun, 239; *Pontius* v. *People*, 82 N. Y., 340, 347;

affirming, 21 Hun, 328 ; *Mayer* v. *People*, 80 N. Y., 364; *People* v. *Shulman* 80 id., 373, note, and cases cited by EARL, J.; *Commonwealth* v. *Merriam*, 14 Pick., 518, 520 ; *Commonwealth* v. *Tuckerman*, 10 Gray, 173 ; *Commonwealth* v. *Coe*, 115 Mass., 501.) This comes within the exception well established, to the general rule of evidence, and necessarily so because motive and intent cannot ordinarily be shown by direct testimony, and resort must be had to external acts and transactions to characterize purpose.

The propositions of the counsel for the defendant are recognized as correct in the abstract, that the transactions of Bork in the matters of the firm, or otherwise relating to the use of the money of the city, are not properly subjects for consideration as testimony, and they were not so unless they came within a common purpose of and between him and the defendant, and that other acts and conduct of either Bork or defendant are not admissible for the purpose of proving that the $2,200 referred to in the indictment were received and appropriated. And this was the view taken by the court at the trial.

It was there held, and the court upon the testimony was permitted to hold, that it was sufficient to justify the inference that a common purpose and combination existed between the defendant and Bork within the scope and line of which those transactions came, and the trial court faithfully observed the well defined limitation of the general rule which excludes evidence of collateral facts even on questions of intent (*Coleman* v. *People*, 55 N. Y., 81 ; *People* v. *Dowling*, 84 id., 478 ; *People* v. *Gibbs*, 93 id., 470; *People* v. *Thoms*, 3 Park. Cr. R., 256, 270 ; S. C., 3 Abb. Ct. App. Dec., 571) and kept within the exception of admissibility. But in some instances testimony tending to prove combination between the defendant and Bork was also evidence of intent, and necessarily properly so, to be effectual as to the latter when and not until the former was sufficiently established.

And the court at the trial did not fail to recognize the principle that excluded the consideration of other conduct and transactions upon the question whether or not the act charged in the indictment was in fact committed by the defendant. (*Copperman* v. *People*, 56 N. Y., 593 ; affirming, 1 Hun, 15 ; *Coleman* v. *People*, 55 N. Y., 90, 91; S. C., 58 id., 555, and cases above cited.)

But by repeated instructions during the progress of the. trial, the court advised the jury of the qualified purpose of testimony received, and of the proper limitation that should be applied to its effect, and this was so carefully and frequently done by the court, as to guard the defendant against prejudice arising from any misunderstanding by the jury of their duty to apply such limitation in their consideration of the evidence.

The learned counsel for the defendant contends that the court should have directed a verdict for the defendant, because he was not present and had nothing personally to do with the taking and converting the $2,200 in question.

This contention involves the inquiry whether the crime charged in the indictment is a misdemeanor or a felony. He insists that it is the latter. At the time the offense is charged to have been committed, and in fact when the act upon which the charge is made was committed, the defendant, as before remarked, was not in this State. And assuming that the crime charged is a misdemeanor, then it follows that the defendant was necessarily treated in the indictment as principal, for all persons in any manner engaged in commission of a misdemeanor are principals ; there are in such case no accessories. (Whart. Crim. Law, § 131 ; *People* v. *Clark,* 4 Denio, 129, 130.) The actual personal presence of the one charged at or near the place of commission of such crime, is not required to render him a principal offender and punishable as such, whether the crime be committed through an accomplice or other agency. (*People* v. *Adams,* 3 Denio, 190, 207; affirmed, 1 N. Y., 173 ; *People* v. *Hall,* 57 How., 346.) The absence of the defendant from the State, required no more proof to establish his guilt, than would have been required if he had been in the city and in the office of the firm, and had not actually participated in the particular act in question. In either case it would depend upon his relation to the transaction arising out of the fact whether the instrumentality could be treated as his. He did not actually direct to be done this specific act, nor was it necessary that he should to constitute his guilt, if, as the jury have found, there was a common purpose existing between him and Bork; a system or scheme to appropriate the city money for the purposes of the business of their firm, which may be characterized as a conspiracy, then the act

of one would be the act of both and each, while that purpose and relation continued. And having reached that conclusion the question of intent to defraud the city within the meaning of the law, was a less difficult one for the jury. The purposes of acts may to some extent be deemed characterized by their consequences. It may be assumed at all events, that there was sufficient to justify the conclusion that the defendant knew that it was the duty of certain constituted authorities of the city to designate banks in which its moneys should be deposited by the treasurer; that the firm of Lyon & Co. was not a designated depository of them, and that those moneys had no business in that firm, and it had no business with them.

In view of all the circumstances, some of which have before been referred to, the jury were authorized to charge the defendant with receiving the $2,200 with the intent to defraud the city of Buffalo. If, however, the offense charged is felony, the conviction cannot stand. The indictment charges him as principal, and he could not be convicted as an accessory merely, under it. (Wharton Cr. L., § 114; *People* v. *Katz*, 23 How., 93, and cases there cited.)

To constitute a principal in a felony the person charged must be present actually or constructively aiding in some manner in the commission of the act, or the act must be done in his absence through some agency or instrumentality, innocent in itself, which includes an innocent person employed by him for the purpose. (*Wixson* v. *People*, 5 Park. Cr. R., 120; *People* v. *Adams*, 3 Denio, 190, 207-8; *McCarney* v. *People*, 83 N. Y., 409, 412, 413.) The evidence does not bring the defendant within the rule required to make him a principal, in his absence, but an accessory only, if the crime is to be treated as felony. But at common law this is not a felony. That definition was there applied to public offenses which occasioned as their punishment total forfeiture of lands or personal estate or both, and to which capital punishment might have been added in some degrees of guilt (4 Bl. Com., 95), which rigors have been modified and removed by statute. The question arises whether the statute providing that "the term felony when used in this act or in any other statute shall be construed to mean an offense for which the offender on conviction shall be liable to be punished by death or by imprisonment in a State prison" (2 R. S., 702, § 30),

was designed to define the crime of felony, or to give a definition to the term felony when used in a statute with a view to the interpretation and effect of the statute in which the word did or might appear. That provision of the Revised Statutes has had some attention of the courts, and has seemingly given some conflict to their decisions upon the question. In some of the cases expressions have been used and some decisions made to the effect that pursuant to that provision, the crimes which may be punishable by imprisonment in State prison are felonies, although not such at common law, and are not in terms declared felonies by the statute creating them. (*Andrew* v. *Dieterich*, 14 Wend., 31, 36; *People* v. *Van Steenburgh*, 1 Park. Crim. R., 39, 45, 46; *Klock* v. *People*, 2 id., 676, 685, 686; *People* v. *Borges*, 6 Abb., 132, 134.) And in other and later cases it is held that the definition of the crime in the respect in question is not so governed by that section of the Revised Statutes as to make all crimes felonies which may be punishable by imprisonment in State prison when the word felony is not in the statutes creating or declaring them. (*Fassett* v. *Smith*, 23 N. Y., 252; *Foster* v. *People*, 50 id., 604; *Nickelson* v. *Wilson*, 60 id., 369; *Thorne* v. *Turck*, 94 id., 90, 95; *Keyser* v. *Harbeck*, 3 Duer, 373, 386; *People* v. *Adler*, 3 Park. Crim. R., 254.)

In *People* v. *Park* (41 N. Y., 21, 24), JAMES, J., in holding that burglary in the third degree was within the statutory definition of the term felony, says : " This is not in conflict with *Fassett* v. *Smith*, as that related to obtaining goods by false pretenses, the punishment for which was in the alternative, State prison, county jail or fine; and hence not within the statutory definition of felony," and he might have added that burglary at common law was a felony.

In *People* v. *Bragle* (10 Abb. N. C., 306), WESTBROOK, J., says, without much consideration, that " the crime charged was a felony because under it, if convicted, the accused could be sent to the State prison." And the Court of Appeals affirmed the conviction without considering the question. (88 N. Y., 585.)

The cases do not furnish a very clearly defined interpretation of the section referred to. But it seems to have come from the necessity arising out of the repeal by statute of the common-law definition of felony, which was done before and carried into the

Revised Statutes. (2 R. S., 701, § 22.) Originally and at common law, the definition was that which the term imported, and when that was abolished it became necessary to have a meaning applied to it whenever it then or thereafter appeared in the statutes. Severity will not be given to the purposes of a penal statute beyond or greater than its terms require, nor will a statute be construed to increase or multiply the cases to which the term felony may be applied, unless such construction is supported by express words or necessary implication. (*Commonwealth* v. *Barlow*, 4 Mass., 439; *Commonwealth* v. *Carey*, 12 Cush., 246, 252.) That section does not in terms or by fair implication declare that every offense punishable by imprisonment in a State prison is a felony, nor does it assume to define or apply the meaning of that term otherwise than in statutes where it is used. (23 N. Y., 257, *supra*.)

The common-law distinction between a felony and misdemeanor, to quite an extent, still exists in this State. But the courts without the aid of express provision to that effect have treated it as the legislative policy or intent. that those common-law felonies which do not come within the statutory definition of the term felony are misdemeanors. (*Shay* v. *People*, 22 N. Y., 317; *People* v. *Rawson*, 61 Barb., 619; *People* v. *Finn*, 87 N. Y., 533; affirming 26 Hun, 58.) This is construction or modification in the direction of relief against the more severe consequences of felony, and does not furnish any support to a construction of the section which would include within that term those offenses not felonies at common-law. These views lead to the conclusion so far as relates to the interpretation of that section of the Revised Statutes, that those offenses known as felonies at common law which come within the statutory definition of the term are such still, and those which do not are not unless made so by the use of the term in some statute other than this section referred to, yet there may be some exceptions established by the courts to that rule which may be treated as modifications of the common-law.

The crime charged in the indictment is a misdemeanor.

The contention of the counsel for the defendant that if he intended to repay the money to the city treasury, he was relieved from the charge of intent to defraud, and entitled to a verdict of acquittal cannot prevail. When the defendant voluntarily received and

appropriated the money of the city, knowing it to be such, the law permitted the presumption of fraudulent intent and the offense was complete. His purpose to repay at some future time could not justify the act.

The support of that proposition would defeat the purposes of the statute. (*Commonwealth* v. *Tenney*, 97 Mass., 50; *Commonwealth* v. *Mason*, 105 id., 163; *Commonwealth* v. *Coe*, 115 id., 481.)

The evidence of the previous good character of the defendant put that fact into the trial, and it was like any other pertinent fact proved entitled to consideration by the jury, and might, as stated in the request to charge, alone raise a doubt. (*Remsen* v. *People*, 43 N. Y., 6.) The court had charged the jury on that question and submitted to them that fact as one to be considered by them as fully as necessary (*Stover* v. *People*, 56 N. Y., 315), and was not required to adopt the language of the request and charge specifically that "good character may raise a doubt in the minds of the jury, when without it none would exist." (*Moett* v. *People*, 85 N. Y., 374; affirming 23 Hun, 60.) It is deemed unnecessary to make reference here to the other exceptions taken on the trial, and state the result of the examination of them, further than to express the opinion that they were not supported by any error of the trial court.

The judgment and order appealed from should be affirmed.

SMITH, P. J., and HAIGHT, J., concurred; BARKER, J., not sitting.

Judgment and order affirmed, and the decision and return remitted to the Court of Oyer and Terminer of Erie county.