STATE vs. SAMUEL EFFLER, alias CHARLES HEFFLER.

1. CRIMINAL LAW—ADMISSION OF EVIDENCE—OTHER OFFENSES—INTENT.

Testimony is admissible of the commission of similar offenses by accused about the time of the commission of the offense charged, where fraud is involved, and intent or guilty knowledge is an essential element, so that, in a prosecution for conspiracy to commit larceny, evidence was admissible that, at about the time of the commission of the offense charged, accused and others procured from witness money by devices similar to those he was charged with having used in the present case, for the purpose of showing intent or design, but not for the purpose of proving another offense.

2. CONSPIRACY—CRIMINAL RESPONSIBILITY—MERGER OF OFFENSES— LARCENY.

The fact that the evidence showed the actual commission of larceny, which was a felony, while the indictment charged a conspiracy to commit larceny, a misdemeanor, did not prevent a conviction for conspiracy; the misdemeanor not being merged into the felony in such cases.

3. CONSPIRACY—CRIMINAL LIABILITY—MERGER OF OFFENSES.

Even if conspiracy, a misdemeanor was merged into larceny, a felony, so as to prevent a conviction for conspiracy, the doctrine would not apply to prevent a conviction for conspiracy, where the larceny was committed in another state.

4. CONSPIRACY—CRIMINAL LIABILITY—JURY QUESTION.

In a prosecution for conspiracy to commit larceny, the evidence held sufficient to take the case to the jury.

5. CONSPIRACY—CRIMINAL RESPONSIBILITY—DEFINITION.

A criminal "conspiracy" is an unlawful combination by two or more persons for the purpose of doing an unlawful act, or doing a lawful act by unlawful means.

6. CRIMINAL LAW—EVIDENCE—DECLARATIONS OF CO-CONSPIRATORS—ADMISSIBILITY.

The acts, declarations, and statements of alleged co-conspirators cannot be considered against accused until the state proves an unlawful conspiracy or combination between accused and the others.

**7.  CRIMINAL  LAW—REASONABLE  DOUBT—INNOCENCE.**

Since an accused is presumed to be innocent, until his guilt is proved beyond a reasonable doubt, the jury must acquit if they have a reasonable doubt on any material element of the offense.

**8.  CRIMINAL  LAW—SUFFICIENCY  OF  EVIDENCE—"REASONABLE  DOUBT."**

A "reasonable doubt," authorizing acquittal, does not mean a speculative or possible doubt, but a real and substantial doubt, which remains in the minds of reasonable men after carefully considering all the evidence.

*(November  22,  1910.)*

PENNEWILL, C. J, and BOYCE, J., sitting.

*Andrew C. Gray*, Attorney General, and *Josiah O. Wolcott*, Deputy Attorney General, for the state.

*Reuben Satterthwaite, Jr.*, for the defendant.

Court of General Sessions, New Castle County, November Term, 1910.

INDICTMENT (No. 32, January Term, 1910) for conspiracy to commit larceny.  Verdict of guilty.  Writ of Error sued out of Supreme Court by defendant.

(See report of case in Supreme Court, 3 *Boyce*—).

The statement of the prosecuting witness, at the trial, as to the facts and circumstances constituting the alleged conspiracy, was in substance as follows:

"I live at 217 West Second Street, Wilmington, and my business is that of a baker. I have lived in Wilmington fourteen years. I had dealings with Samuel Effler, *alias* Charles Heffler, the defendant, in the year 1909. In March 1909, a man named Needles, who lived in the next block, used to come to my place every day to buy bread. He had a drygoods store at 228 King Street. The defendant Effler came to the house with Needles. Needles and Effler came around to my place and told me they had a chance to buy out a big business in Philadelphia, and could make a couple thousand dollars, and if I could invest $5,000., Effler and Needles would go together and invest $5,000. I told them I would think about it. I finally told them I would put up some money and go in and buy this store. I told them that $3,500. or $3,600. was all that I could put up. Another man came with Needles and Effler to see me about buying out this store in Philadelphia. He called himself Gaylor. I afterwards found

Facts.

out by the papers that his name was Goldstein. After seeing this man Gaylor in prison in Rochester, New York, I learned that Goldstein was the man's name. Goldstein said that he had a business that he would like to sell, and Effler and Needles said they would like to buy, and could make so much money—a couple thousand dollars—and Needles and Effler should put in $5,000. and I $5,000. to buy them out. The defendant Effler came to see me about three times at the store, all the time with Needles, and talked about this matter. When Goldstein, *alias* Gaylor, was in my place with Effler and Needles, they all talked about buying Goldstein's store out in Philadelphia. I finally agreed to go in with them, and I got the $3,600. from the bank. I got this $3,600. in two different amounts on my check. The first time I got $1,500. I got $2,100. afterwards. When I got the last sum of $2,100. I did not go to Philadelphia on that day, but it was eight or ten days maybe before I went to Philadelphia. In the meantime, I had this $3,600. at home. When they first started talking to me about this proposition, I think it was from the first to the fifteenth of March, 1909. I know this man Effler very well. I am sure he is the right man. Needles and Effler both asked me to go to Philadelphia and buy out this stock, and I went there to carry out this agreement to buy the stock. They all three told me that we needed to have the cash because the people would not accept a check. When I went to Philalelphia with these two men, Effler and Needles, I had the $3,600. in my pocket. When I got in Philadelphia Effler and Needles said to me that before buying out that stock we would go and see a friend of theirs who knows what the stock is. They told me it was drygoods. I did not know anything about drygoods. When they suggested that we go to see this friend, I said all right. It would be better for us to have one man more. We went to Tasker Street or Thatcher Street—I don't know anything about Philadelphia, maybe go there one or two times a year. We went there by trolley car and went into a house on that street. I saw a man and a woman there. I don't know who they were. I had never seen them before. When I went in the house, I had my money in my pocket. This man Effler had money. He showed me he had money. I

didn't examine the money they had. I could not tell how much they had, but it was a big bunch of money. When we got in this house on Tasker Street, we were all sitting at the table in the first room down stairs. Effler counted how much money he had and when he started to count the money, two detectives made a noise in pushing open the door and came in the room and said we were the people they were looking for, that we had counterfeit money, and took a ten dollar bill from the table and tore it open down the length of the bill, making two bills out of one, so that one side of each was blank. I thought they were detectives then, now I know they were the same robbers like these people here. When they tore open this ten dollar bill, they said: 'Ain't you got any money?' I said: 'Yes.' The other detectives said to show it up, and I showed it up. My money was all right and he took my money and mixed it up with the other. The detectives said 'Needles and Effler, you are arrested,' and Needles and Effler told me in Jewish 'You had better step out because there is a little trouble with our money. I will see you afterwards.' And I was excited and left the room and went out on the pavement. I was right by the door on the step, and waited three or four minutes and I just started to go in the doorway, and I could not find anybody in and I never thought of the money, I was so excited, but I never thought the money was lost. When I got back in the room, the people were gone with the money. There was nobody in the room. This took place in Philadelphia, between seven and eight o'clock, and I came home that night and I went to Needles' store and I could not get in the store. Everything was empty. After that happened, I saw lots of people going there but not the same people. I never saw Effler there anymore. I saw this man Goldstein in Rochester, New York, in prison. After I lost my money, I saw in a Jewish paper where a man in Philadelphia got robbed of $5,000., like I was robbed, and I took the train and went to Philadelphia, and saw Effler on the street. It was eight or nine months after I lost my money. I was on a street car, with Mr. Ratledge, and I saw the man standing on the street, and that is the man (indicating the defendant)

that I saw standing on the street.    That is the right man all right, and I had him arrested."

After proving by the prosecuting witness and other witnesses, the facts tending to establish the alleged conspiracy,  the state produced as a witness one Silverman and propounded to him, among others, the following question:

"I will ask you whether or not in the year 1909, fairly close to March, 1909,  this defendant, in company with other men, secured from  you any money by any means or devices, or designs, similar to those which you have heard Mr. Reches (prosecuting witness) testify about in his case?"

(Objected to by counsel for defendant as immaterial, unless the  state shows that the defendant has been convicted of the offense sought to be proved;  citing 2 *Russell on Crimes,* 700; *Russell on Criminal Evidence,* 578; *Williams v. People,* 166 *Illinois* 132, 46 *N. E.* 749.    The state contended that the testimony sought to be introduced would make out a plan or scheme of operation, which would tend to corroborate the preceeding witnesses of the state and to establish the probability of the commission of the offense charged in the present case; citing *State v. Raymond,* 53 *N. J. Law Rep.* 260,  21 *Atl.* 328; *State v. LePage,* 57 *N. H.* 295, 24 *Am. Rep.* 69.)

PENNEWILL, C. J., delivering the opinion of the court:

On account of the importance of the question raised by the state's offer,  we have given it as careful consideration as was possible since the adjournment last evening.

The witness, now upon the stand, was produced by the state to show that the defendant, together with the other alleged conspirators, about the time of the commission  of the offense alleged in the indictment, cheated and defrauded the witness in the same manner as he is charged with having cheated and defrauded the prosecuting witness in the present case.

The testimony is offered under the rule or principle of law which permits similar offenses committed by the defendant at or about the time of the commission of the one charged, to be proved, where fraud is involved in the charge and where the in-

tent or guilty knowledge is an essential element of the charge to be proved. There is no doubt about the principle. Indeed, it has been recognized in this state in the case of *Fait and Slagle Company v. Truxton*, 1 *Penn.* 24, 39 *Atl.* 457. But the question now is as to the application of such a rule in a case like the one now before us.

The rule seems to be especially applicable to the case of conspiracy and fraud.

*Wigmore*, in his work on *Evidence* (*Volume* 1, *p.* 302), says:

"In most cases of conspiracy and fraud, the question of intent or purpose or design in the act done, whether innocent or illegal, whether honest or fraudulent, rarely admits of direct and positive proof; but it is to be deduced from various circumstances of more or less stringency and often occurring, not merely between the same parties, but between the parties charged with the conspiracy or fraud and third persons. And in all cases where the guilt of the party depends upon the intent, purpose, or design with which the act was done, or upon his guilty knowledge thereof, I understand it to be a general rule that collateral facts may be examined into, in which he bore a part, for the purpose of establishing such guilty intent, design, purpose or knowledge. * * * In short, wherever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, tending to establish such intent or knowledge, are proper evidence."

In the case of *Luckey v. Roberts*, 25 *Conn.* 492, *Ellsworth, Judge*, used the following language:

"We think there is nothing wrong in the ruling of the court that the testimony of S. M. Middlebrook should be received for the consideration of the jury. Whenever a conspiracy is alleged as the means of effecting a fraudulent purchase of goods, it is the constant practice of the courts to receive, as evidence of the character of the act, like fraudulent acts between the same conspirators, at or about the same time and of the same nature, in furtherance of the fraudulent design. And so long as the conduct of men is allowed to throw light upon their motives of action, so long such evidence is most proper to go to the jury when those motives are the subject of inquiry."

In the case of *People v. Peckens*, 153 *N. Y.* 592, 47 *N. E.* 888, the court used the following language:

"On the trial the court permitted the prosecution to prove transactions of the defendant and his confederates with other persons, which, while they were not in all respects identical with that for which the defendant was tried, still, they were quite similar in all their essential particulars. To the admission of this evidence the defendant objected upon the ground that it was immaterial, incompetent and irrelevant. The objection was overruled and the defendant excepted. There were numerous rulings of this character which present the question whether evidence of other similar transactions was admissible, either to show the intent of the defendant, or as circumstances tending to establish a conspiracy between the defendant and his confederates. On the trial of an indictment for obtaining property by false representations or pretenses, the allegation that they were made with an intent to defraud may be proved by transactions with other parties which tend to show a fraudulent scheme to obtain property by devices similar to those practiced upon the the complainant, providing the dealings are sufficiently connected in point of time and character to authorize an inference that the transaction was in pursuance of the same general purpose. Such representations may be proved, although no property was obtained, where the evidence tends to show that, at the time, the defendant was engaged in a fraudulent transaction. While this testimony is not admissible upon the question whether the alleged representations were made, it is admissible as tending to show a motive to obtain the property in pursuance of a general fraudulent scheme. *Mayer v. People*, 80 *N. Y.* 364; *Shipply v. People*, 86 *N. Y.* 375 (40 *Am. Rep.* 551); *People v. Everhardt*, 104 *N. Y.* 591 (11 N. E. 62); *People v. Dimick*, 107 *N. Y.* 13, 31 (14 *N. E.* 178). Therefore it is quite obvious that the evidence offered by the prosecution was admissible, unless the transactions were so remote as not to justify an inference that they took place in pursuance of a general plan or scheme to defraud, under which the representations set out in the indictment were made."

In the case of *Commonwealth v. Eastman et al.*, 1 *Cush.* (*Mass.*) 216, 48 *Am. Dec.* 596, the court said:

"This species of evidence would not be admissible for the purpose of showing that the defendants had also committed other like offenses, but simply as an indication of their intention in making the purchases set out in the indictment. It is analogous to the proof of the scienter in indictments for passing counterfeit money, by showing that the defendant passed other counterfeit money to other persons about the same time. Such evidence is always open to the objection that it requires the defendant to explain other transactions than those charged in the indictment; but, when offered for the limited purpose above stated—that of showing a criminal intent in the doing of the act charged in the indictment— it has always been held admissible. In *Rex v. Roberts*, 1 *Camp.* 399, such evidence was admitted as competent." †

While we hold that the testimony offered is admissible, we base our ruling upon the nature and facts of this particular case. And while we have quoted from authorities in other states, we do not want to be understood as holding that the rule contended for by the state shall be extended to all cases that would seem to be covered by the general language employed in the cases from which we have quoted. We simply hold that the testimony offered is admissible in this case.

The witness thereupon answered in substance as follows:

"I have a jewelry store at 705 South Second street, Philadelphia. The latter part of May, or the first of June, a man who called himself Goldstein, and whom I afterwards saw in prison at Rochester, N. Y., under the name of Tiddlebaum, came into my store and said: 'Do you buy diamonds?' I said: 'Yes, I buy diamonds and anything that I can make anything on in my jewelry store.' He said: 'I am an importer of diamonds from Antwerp. I sell diamonds cheaper than twenty per cent.' I said: 'Well, I would like to see the diamonds you have.' He took out a bundle of diamonds from his pocket and showed them to me. I saw that they were perfect whole white diamonds. I picked up two of the diamonds and put them on my scale and weighed them, and they were two and a quarter carats; and I said:

'How much do you want for those diamonds?' He said: 'I want $400 for those diamonds.' I paid him $400, because it was a bargain; and I afterwards sold them for $500. Before he went out from my store we were sitting there talking business, and I said: 'When will I see you again?' And he said: 'Maybe in two or three weeks. I am going to Portland, Oregon, and will be back in two or three weeks, and I will sell you more diamonds.' So in two weeks, which was the thirteenth of June, on a Sunday, about nine o'clock in the morning, Goldstein came to my store and said: 'Mr. Silverman, are you ready to buy diamonds?' And I said: 'No, it is Sunday. I have not got my money here. I have got all my money in bank.' Goldstein said: 'We don't want to take checks. We want spot cash money, because I don't deal with checks. I deal just for cash money.' He said he was the chief business man, the biggest salesman for the firm. I said: 'It is Sunday, and I cannot buy diamonds now.' He said: 'Well, I will leave it until Monday to buy diamonds, if you want to. How much money can you raise to buy diamonds with? I will sell you much.' I said: 'I will raise at the highest $4,000 or $5,000. I cannot raise more.' He said: 'No, no; my firm, when they deal, they deal for big amounts—$15,000 or $20,000 worth. They don't deal with such kind of people who have only $5,000 or $6,000.' I said: 'I can't raise more than $5,000.' He said: 'I will tell you what I will do. I will get a partner for you. I have a man here in town by the name of Heffler'—that is the prisoner sitting here—'he is a man that has dealt with me two years. I sold him diamonds and he made a whole lot of profit.' I said: 'Well, I would like to see the man; maybe I will make a partnership with him and buy $10,000 or $15,000 worth of diamonds.' He said: 'All right, I will take you to the man.' I said: 'Give me your number or where your hotel is.' And he said: 'I am at Green's Hotel.' I said: 'I will be at the hotel between 1 and 2 o'clock.' This was on Sunday, June thirteenth. He said: 'Never mind, I will come to your place, and I will take you there to Mr. Heffler, the man I told you about.' So between 1 and 2 o'clock, he came to my place, 705 South Second street, and we went to Third street and took the car, and went to Pierce street,

Evidence.

and got off, and he took me to the house 408, I think it was.   I
don't remember, because it is a new number.   And he rang the
bell, and some lady came out from the house and said: 'Hello,
Mr. Goldstein.'—Mr. Tiddlebaum, it is now, who is in prison in
Rochester.   He was the only one with me at the time.   He said
to the woman: 'Is Mr. Heffler in the house?'   And the woman
said: 'Yes, sir;  he is in the house, and he is waiting for you.'
So they took me out in the front room, and when I got in there I
met Heffler and Fireman, the man with a queer eye.   I am sure
that the prisoner here is the man Heffler.   I would know him
among a thousand men, because he robbed me of my money.
When I came into the front room, there sat Heffler and Fireman
together, and Goldstein introduced me.   He said: 'This is
Mr. Fireman, Mr. Silverman, and this is Mr. Heffler—a nice man.'
After we were introduced they sat down, and I took a seat also.
Mr.  Heffler said: 'Well, would you like to go in partnership
with me?'   And I said: 'How much money do you have?'   He
said: 'I have got $10,000 to buy diamonds.'   He said: 'How
much have you got?'   I said:   'I have got $5,000 to put in dia-
monds.'   He said: 'All right;  we will make a whole lot from
diamonds.   We will sell a great many diamonds, because I know
vey nice people and I buy diamonds.'   He said, 'I am a rich man,'
and showed me the furniture and everything.   I said: 'When will
you be ready to make the partnership with me?'   He said: 'I am
ready now.'   I said: 'I have not got the money with me;  a
little of my money is in the bank, and I have some friends' money
that I have got in the store.'   He said:   'When will you be ready
to put in the $5,000'?   I said: 'On Thursday or Friday I will be
ready.'   And Goldstein said: 'Will you give me a deposit, be-
cause I need to go to New York and bring new diamonds, be-
cause I have got old diamonds here?'   Heffler took out a bundle
of money and said to Goldstein: 'Here is the money for you.'   I
couldn't tell how much it was.   He said: 'Mr. Silverman, will
you give me a deposit?'   I said:   'I have not got much with me.'
And Goldstein and Heffler said:  'Never mind, we will go together
with you to your house.'   I said:   'I have not got it in the house;
but if you will be there Monday, I will give you some deposit.'   On

Monday I was in the store, and Heffler and Fireman and Goldstein came to my house together, between 9 and 10 o'clock, and I took them in the dining room, and I had $50 and I said: 'Here is $50 deposit and if you are afraid, I can give you more.' Goldstein said: 'Never mind, Heffler gave me a deposit.' But I made an agreement with Heffler that he and I should go into partnership. Of course I was foolish to believe those people, but I gave them the $50 deposit. Goldstein said: 'I will be ready Thursday to bring to you the diamonds.' And Heffler said: 'Where will be the place to get the diamonds, to recognize the diamonds and see whether they are correct diamonds?' I said: 'In my store'—that I would like to see the diamonds in my store, and I would like to see my old diamonds, and that he should bring to my store the $15,000 worth of diamonds, so that I could recognize the diamonds before I gave him the money. Heffler said: 'Never mind that; it is too much trouble, because to recognize $15,000 worth of diamonds would take three or four hours, and you could not do it here with your customers bothering you; you could not see them in two days.' He said: 'I have got a front room at my sister's house on Pierce street, and will give you the room.' He said: 'I will take you in the room together with Goldstein and Fireman, and you can recognize the diamonds, and when you say they are all right, and see whether they are genuine diamonds or not, you pay the money.' So Heffler took me in the car to Pierce street, and came to 710 Pierce street, and he knocked at the door, and there came some lady, and she said: 'Hello, Charlie, what do you do here?' He said: 'I have got to rent a room for some people. You know the people.' She said: 'All right; I can rent you the room.' I came on inside with him, and he said it was a nice front room. He said: 'How much do you want for it by the week or day'? And she said: 'Well, I want six dollars.' And he took out the money from his pocket and paid her $6, and she gave him the key to the room. So I went with Heffler to my house and met Goldstein and Fireman at my house waiting for me. And after that Goldstein said to me: 'Well, Mr. Silverman, would you like it better in the store or in the front room, to look at the diamonds?' I said: 'Well, it

Evidence.

makes no difference.' And Heffler said: 'All right.' And they said: 'Good bye.' Goldstein, Heffler, and Fireman went away from my store together.

"After that I came home, and my wife told me that Goldstein was there to bring me back the $50 deposit because he did not want it; that he could not bring the diamonds until Thursday. Heffler came to my house on Monday, and told me that Goldstein could not bring the diamonds until Monday, and that he did not want my $50, and that he said: 'Never mind, he will get you the diamonds. He is going back to New York.' Heffler was back to my house Tuesday and Wednesday, until I raised my money. He was there three or four hours in the day sitting in my front room and in the store, and watched me where I had my money. That was this man Heffler here. On Thursday, about 4 o'clock, I went back with him to 710 Pierce street, to the same room where we had gone on Monday. Heffler said: 'Mr. Silverman, are you ready?' And I said: 'Yes, I have my money here.' I had $5,000 in a satchel. It was too much money to put in my pocket. It was in $100 bills, $20 bills, and $5 dollar bills. I had it in the satchel, and Heffler goes with me, and when we came to the same room, 710 Pierce street, he knocked at the door right away, and Goldstein says: 'Come in. I have got the diamonds here.' Goldstein opened the door from the front, the street. The same Fireman with the crooked eye was in the room, and Goldstein, who is in prison now; and Heffler and I went in the room, and I saw there was a table, and on the table was tissue paper the same like diamonds are wrapped in. I did not see the diamonds, because I had not time to see them. They didn't unwrap the paper. Goldstein said to Heffler: 'Are you and Mr. Silverman ready to buy the diamonds in partnership?' He said: 'I have got the diamonds here on the table.' Heffler said: 'Yes, I am ready.' After that I took my bunch of money from the satchel and gave it to Heffler in his hand, and Heffler was to raise $10,000, and he took out his money from his pocket and put it on the table, all the money on the table together. I counted my money in my house, and we put the whole money on the table, and counted the whole money there in the room. About a minute or a minute

and a half later about seven or eight people broke the door in, and one short fellow, a big fat man, came in and said: 'Here is the place where they are making counterfeit money.' He put his hand right on the money and said: 'Nobody goes out from this room, because these are the people that are making counterfeit money.' Two of them were standing near the door and had revolvers. This man used to be captain of the detectives, he said, and he took fom the bundle of money on the table a $20 bill and split it apart, making two bills out of it, so that it showed a $20 bill on each side and the other side blank. When he said, 'This is the place where they make counterfeit money,' I was excited, and I said, 'I know mine is good money.' I was so excited that I did not know what I was doing, and I didn't know what I could do. This man that used to be captain of the detectives said, 'All you people are arrested,' and he took the satchel under the table—not my satchel—and put all the money on the table and the diamonds together in the satchel. They took out Goldstein, and he left his hat in the room. Two of the detectives arrested him. The other two detectives arrested Fireman, and the other two detectives arrested Heffler, and I was in the room with two detectives more and the captain. They said, 'Stay here, don't go out,' and said, 'Come on, I arrest you, too; for you are with the same bunch making counterfeit money.' I said: 'I make no counterfeit money. What kind of a game is it?' He said: 'Come on, I will take you to the police station.' And he took me out in the street and let me go. I didn't know what I could do after that, and I came home, and later the same day Heffler came to my house and said: 'Mr. Silverman, don't be afraid. I will get your money back within a half hour or an hour. I will spend $10,000 but that I will get your money back.' I was so excited that I went to my lawyer right away. This man was afterwards arrested."

When the state rested, counsel for defendant asked the court to instruct the jury to return a verdict of not guilty, for the following reasons:

"It is respectfully submitted that the defendant cannot be convicted of the crime of conspiracy to commit larceny for the

following reason: The indictment charges the defendant with conspiring to commit larceny, and the evidence produced by the state shows conclusively that the larceny was actually committed. Under the laws of our state the crime of conspiracy is a misdemeanor and that of larceny is a felony. Where the object of a conspiracy is to commit a crime of a higher grade, to wit, a felony, and the object is accomplished, the defendant cannot be prosecuted upon the charge of conspiracy, because the misdemeanor would merge in the higher charge of felony. Probably the best text-book authority on the subject of criminal conspiracy and agreements is by *Hampton L. Carson*, who on pages 223 and 224 of his text-book discusses this principle of merger and holds that where a conspiracy consists of an agreement to commit a felony, and the felony is actually executed, that the misdemeanor merges in the felony, but where there is a conspiracy to commit a misdemeanor only, even though the conspiracy be executed, there is no merger because the two crimes are of the same rank.

"In the case of *United States v. Gardner*, (*C. C. N. Y.*) 42 *Fed.* 829, the court at page 830 used the following language:

" 'By the laws of Congress the offense of conspiracy is a misdemeanor and that of larceny a felony.' According to the authorities, where the object of the conspiracy is to commit a crime of a higher grade, and the object is accomplished, a prosecution for the conspiracy cannot be maintained, because the lesser offense is merged in the greater.

" '*Mr. Wharton* states the doctrine thus:

" 'The technical rule of the old common-law pleaders, that a misdemeanor always sinks into a felony when the two meet has in some instances been recognized in this country, and may perhaps be considered in Massachusetts, New York, and Pennsylvania as the settled law, though with very little substantial reason.

" 'Not only is this the rule recognized by the courts of the states mentioned by *Wharton*, but it is the general declared doctrine of the adjudications in this court [citing several cases].

" 'The reason why a conviction cannot be had for the conspiracy to commit a felony, or for an attempt to commit a felony

Argument.

when it appears that the felony was actually committed, is that an acquittal for the minor offense would not bar a subsequent indictment for the major, and consequently the accused might be put twice in jeopardy for acts which were only constituent parts of one offense.'

"In the case of *People v. McKane*, 7 *Misc. Rep.* 478, 28 *N. Y. Supp.* 397, the court held that in the state of New York a conspiracy to commit a felony when executed by the conspirators was merged in the felony and a prosecution for the conspiracy would not lie.

"In *Commonwealth v. Blackburn*, 62 *Ky.* 4, indictment charged a conspiracy to commit a felony which was consummated by the actual commission of treason, and it was held that the conspiracy, being a mere misdemeanor, was merged in the higher crime of treason.

"In the case of *State v. Mayberry*, 48 *Me.* 218, the court at page 238 stated as follows: 'When there is a conspiracy to commit a higher offense and the offense is actually committed, the conspiracy is merged; but when both are of the same grade there is no merger.'

"The case of *Commonwealth v. Kingsbury et al.*, 5 *Mass.* 106, was a charge of a conspiracy to commit a felony, and the court held that if the felony was actually executed the charge of conspiracy would merge.    The court also stated that the rule would be the same if the charge had been conspiracy to commit a misdemeanor.    This case has been criticised for that reason, but as a matter of fact the charge in this case was conspiracy to commit a felony.

"In the case of *People v. Richards and Pelton*, 1 *Mich.* 217, 222, 51 *Am. Dec.* 75, the court, at page 222, stated: 'It is no doubt the law that if the felony is proved the conspiracy must at once merge.'

"In the case of *Commonwealth v. Delany et al.*, 1 *Grant, Cas.* (*Pa.*) 224, the court held that an indictment charging conspiracy to commit a misdemeanor did not merge in the misdemeanor when committed, but stated that if the indictment had been for conspiracy to commit a felony and the felony had actually

been committed there would have been a merger.

"The case of *People v. Mather*, 4 *Wend.* (*N. Y.*) 229, 265, 21 *Am. Dec.* 122, was a case of the defendant being indicted for conspiracy to commit a misdemeanor, and it was contended that when the misdemeanor was actually committed the crime of conspiracy was merged, and the court, at page 265, held as follows:

" 'It is supposed that a conspiracy to commit a crime is merged in the crime where the conspiracy is executed. This may be so where the crime is of a higher grade than the conspiracy and the object of the conspiracy is fully accomplished; but a conspiracy is only a misdemeanor, and where its object is only to commit a misdemeanor it cannot be merged.' "

The state, in opposing the motion for binding instructions to the jury to acquit the defendant, cited the following authorities: *People v. Poindexter*, 243 *Ill.* 68, 90 *N. E.* 261 (1909); *Commonwealth v. Walker*, 108 *Mass.* 309 (overrules other cases—1871); *Com. v. Blackburn*, 1 *Duv.* (62 *Ky.*) 4; *State v. Setter*, 57 *Conn.* 461, 18 *Atl.* 782, 14 *Am. St. Rep.* 121 (1889); 8 *Cyc.* 644; *Id.* 684. § 7; 2 *Wharton, Crim. Law.* 1344; *Id.* § 414; *Graff v. People*, 208 *Ill.* 312, 70 *N. E.* 299 (1904).

PENNEWILL, C. J., delivering the opinion ot the court:

A motion has been made by the defendant that the court direct the jury to return a verdict in favor of the defendant on the following ground—using the language of the counsel for the defendant in his motion:

"The indictment charges the defendant with conspiring to commit larceny, and the evidence produced by the state shows conclusively that the larceny was actually committed. Under the laws of our state the crime of conspiracy is a misdemeanor and that of larceny is a felony. Where the object of a conspiracy is to commit a crime of a higher grade, to wit, a felony, and the object is accomplished, the defendant cannot be prosecuted upon the charge of conspiracy, because the misdemeanor would merge in the higher charge of felony."

The contention of the defendant can be best stated perhaps by using the clear and simple language of the Connecticut court in

the case of *State v. Setter*, 57 *Conn.* 465, 18 *Atl.* 782, 14 *Am. St. Rep.* 121.

"The broad claim of the appellant is that, if the crime to commit which the conspiracy is formed is actually committed, then the conspiracy is merged in the committed crime and ceases itself to be a crime at all. It is admitted, however, that if the contemplated crime be of that class of crimes called misdemeanors, the conspiracy is not merged; and that in a case where there is a conspiracy to commit a misdemeanor and the misdemeanor is actually committed, the offender may be punished for the conspiracy and for the misdemeanor also. But it is insisted that if the contemplated crime is of that class called felonies, then if the felony is actually committed the conspiracy is merged and no longer exists as a separate and distinct offense. Put in its simplest form the argument is this: Conspiracy is a misdemeanor; theft is a felony; a misdemeanor is a less crime than a felony; and so in a case where there is a conspiracy to commit a theft, that crime being a felony, and the theft is actually committed, the less offense is merged in the greater."

Counsel for the defendant has produced some authorities to sustain his motion, but upon an examination of those cases we are impressed with two things: (1) That they are for the most part old cases; and (2) that practically all of them are based upon the authority of the case of *Commonwealth v. Kingsbury*, 5 *Mass.* 106, which has been not only severely criticised by various courts in other cases, but has been disregarded, if not overruled, by a later case in the same state, viz., *Commonwealth v. Walker*, 108 *Mass.* 309.

Some of the other cases seem to be inconsistent with later decisions in the same state, and particularly in Kentucky, where the case of *Commonwealth v. Blackburn*, 1 *Duv.* (62 *Ky.*) 4, was distinctly overruled by the later case of *Wait v. Commonwealth*, 113 *Ky.* 821, 69 *S. W.* 697.

We think the decisive weight of recent cases, as well as of reason, is opposed to the contention of the defendant.

We have not had the time to quote from the various cases which are against the merger rule, and which seem to us to be

very strong, and must be content with a citation of them. (See cases cited by state.) We will, however, quote briefly from a very few of the authorities cited.

*Mr. Wharton* in his recent treatise on *Criminal Law* (*Volume 2, § 1344*) says:

"The technical rule of the old common-law pleaders, that a misdemeanor always sinks in the felony when the two meet, has in some instances been recognized in this country, though without good reason. In England, as has already been noticed, the inconvenience of the principle, as well as its absurdity, has attracted grave judicial scrutiny, and eminent judges have declared they felt no disposition to extend a rule by which a man, when indicted for a misdemeanor, may be acquitted because it is doubtful whether the offense is not a felony, and who, when indicted for a felony, may be acquitted because it is doubtful whether the offense is not a misdemeanor. This has lead, if not to a repudiation of the doctrine, at least to its restriction within narrow limits. Thus, it has been said that even when the felony is executed there may be cases where the conspiracy may still be pursued as an independent offense. Thus, when in 1848, the defendants, who were the workmen of L., a dyer, were charged with conspiring to use his vats and dye in preparing for market goods not belonging to him, and without his assent, it appeared on the trial that L. permitted the defendants to use his dye, etc. for their own use, and for such materials as he intrusted them with, but that they made a profit by using them for other materials without his knowledge. After conviction and removal to the Queen's Bench, a motion in arrest of judgment was urged on the ground that, as larceny in abstracting the prosecutor's material was proved, the conspiracy merged. But the Court of Queen's Bench were unanimous in entering judgment on the verdict. 'A misdemeanor which is part of a felony;' declared Lord Denman, C. J., in summing up the case, 'may be prosecuted as a misdemeanor though the felony has been completed; and the attempt, upon the argument, to make a distinction between misdemeanors by statutes and those by common law was not successful, as the incidents to a misdemeanor are not affected by the origin

in law from whence it is derived. It was further urged by the defendants that unless the defense was sustained they might be twice punished for the same offense; but this is not so, the two offenses being different in the eye of the law. If, however, a prosecution for felony should occur after a conviction for conspiracy, it would be the duty of the court to apportion the sentence for the felony with reference to such former conviction.' On the same reasoning it was decided by the fifteen judges that a conviction for the misdemeanor of carnally knowing a girl under twelve years old would stand, notwithstanding the felony of rape was proved on trial. So far as the authority of the English courts goes, therefore, the doctrine of merger, if not now abandoned, is confined to that small class of cases where the misdemeanor is the first step in the commission of the felony. And in several of our courts a disposition has been exhibited to reject the doctrine in all cases, and this is reasonable in cases where the conspiracy which the prosecution elects to pursue is a mere ingredient in the felony whose *differentia* the prosecution elects to reject.

"In New Jersey, a charge of conspiring to procure an indictment by perjury does not charge a felony which merges the conspiracy."

Quoting from 1 *Bishop's New Criminal Law, section* 814 says: "A conspiracy to commit a felony is a step toward the consummation, but it is only misdemeanor. There are American cases which seem to hold that if parties on trial for such a conspiracy are shown to have proceeded in it to the accomplished felony, the misdemeanor is merged, and they cannot be convicted—a rule, the authorities agree, not applicable where the object of the conspiracy is a misdemeanor. This doctrine * * * is contrary to just principle; it has been rejected in England; and though there may be states in which it is binding on the courts, it is not to be deemed general American law."

In the case of *Graff v. People*, 208 *Ill.* 322, 70 *N. E.* 303, the court said: "If the indictment be for a conspiracy which is a misdemeanor, and the conspiracy comprises the doing of many things, and the proof shows that among the overt acts done pursuant to the conspiracy is a felony, it would seem the greater

weight of authority is that a conviction may nevertheless be had for the conspiracy. *Johnson v. State*, 26 *N. J. Law* 313; *Commonwealth v. Blackburn*, 1 *Duv.* (*Ky.*) 4; *People v. Petersen*, 60 *App. Div.* 118 (69 *N. Y. Supp.* 941); *United States v. Rindskopf*, 6 *Biss.* 265 (*Fed. Cas. No.* 16,165); *State vs. Grant*, 86 *Iowa* 217 (53 N. W. 120); 20 *Am. & Eng. Ency. of Law* (2d Ed.) 605; 3 *Greenleaf on Evidence*, § 90; *State v. Murray*, 15 *Me.* 100."

But even if the merger rule or doctrine, which is operative in a few of the states, applied here, it could not be invoked in this case for the reason that the object of the alleged conspiracy —to wit, the larceny—was not accomplished in this state, but, if accomplished at all, it was in Pennsylvania.

If the conspiracy was complete here, surely the fact that the larceny was committed in another jurisdiction could not preclude this state from trying the offense that was committed here. The fact that another state might try the defendant for the larceny, which is thought to have been committed there, cannot oust this state of its jurisdiction of the conspiracy offense, which was committed here if it was committed anywhere. And there is authority for such a reasonable conclusion.

In the case of *People v. Poindexter*, 243 *Ill.* 76, 90 *N. E.* 264, the court said: "It is urged that if the proof shows a conspiracy, which is a misdemeanor, it also shows that the object of the conspiracy, which was the commission of a felony, was carried out, and that therefore the misdemeanor merged in the felony. The conspiracy was formed in Illinois and some action towards its completion was taken in this state. The consummation of its purpose was in Indiana. A conspiracy in one state or country does not merge in a felony committed in another."

The motion is refused.

PENNEWILL, C. J., charging the jury:

Gentlemen of the jury:—It is charged in this indictment that the defendant, Samuel Effler, alias Charles Heffler, on the thirteenth day of March, 1909, in this city and county, did unlawfully and wickedly conspire, combine, confederate and agree with other persons feloniously to take, steal and carry away certain

money of one Louis Reches of the aggregate value of $3,600.

We are asked by the defendant to direct the jury to return a verdict of not guilty. This we decline to do, because we think the case should be submitted to and determined by the jury under the evidence and the law as we shall declare it to you.

The crime charged is that which is known in the law as conspiracy, and it has been defined by this court as "an unlawful combination entered into by two or more persons for the purpose of doing an act which is unlawful, or the doing of a lawful act by unlawful means." *State v. Clark et al.*, 9 *Houst.* 536, 33 *Atl.* 310.

In order to sustain this indictment it is necessary that the state should have shown by the evidence to your satisfaction that there was an unlawful combination by and on the part of the defendant and one or more other persons to do the thing charged in the indictment. The acts, declarations and statements of other persons cannot bind this defendant until the state proves to your satisfaction that an unlawful conspiracy or combination exists, as charged in the indictment, and that this defendant was a party to such unlawful conspiracy. *United States v. Richards* (*D. C.*) 149 *Fed.* 452.

The court admitted as competent and relevant evidence in this case the testimony of the witness Silverman, under the rule of law that permits the proof of other transactions by the alleged conspirators, similar in character to that charged in the indictment and committed at or about the same time. But we say to you that such evidence was admitted, as we stated at the time, not for the purpose of proving the commission of another crime, but only for the purpose of showing the intent, design, or plan of the defendant in this case, and it is not to be considered by you at all unless you are satisfied from other evidence that there has been proved an unlawful combination entered into by the defendant and others as charged in the indictment. In other words, it can be considered only in determining whether the defendant's intent, design or plan was lawful or unlawful.

In every criminal case the defendant is presumed to be innocent until his guilt is proved beyond a reasonable doubt; and it is necessary for the state, in order to convict the prisoner, to

prove every material element of the charge beyond a reasonable doubt.

It is your duty, gentlemen, to carefully and conscientiously weigh and consider all the evidence in the case, and if, after having done so, you should be satisfied beyond a reasonable doubt that the defendant committed the crime charged, your verdict should be guilty. If, however, you should believe he did not commit the crime, or should entertain a reasonable doubt of his guilt, your verdict should be not guilty. But reasonable doubt does not mean a speculative or mere possible doubt. It means a real, substantial doubt, and such a doubt as will remain in the minds of reasonable, fair-minded and conscientious men after a careful consideration of all the evidence in the case.

Verdict, guilty.